809 A.2d 18

E. Diane TURNER

v.

Donald P. TURNER, et al.

No. 01871, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 30, 2002.

358

Leslie L. Gladstone, Baltimore, for appellant.

T. Bruce Hanley, Towson, for appellee, Donald Turner (T. Allen Mott and Cowie & Mott, P.A., Baltimore, on the brief, for appellee, Stage Lighting, Inc.).

Argued before HOLLANDER, JOHN J. BISHOP and JAMES S. GETTY (Retired, Specially Assigned) JJ.

HOLLANDER, Judge.

This appeal arises from two law suits instituted by E. Diane Turner, appellant, in the Circuit Court for Baltimore County. One involves the dissolution of the marriage of appellant and Donald Turner, appellee. The other concerns Mr. Turner and the family business, Baltimore Stage Lighting, Inc. ("BSL" or the "Company"), appellee,[1] a close corporation wholly owned by the Turners.

---

1. Unless otherwise noted, when we use "appellee" in the singular we are referring to Mr. Turner. Similarly, unless the context suggests

In a sense, the Turners epitomize the rags to riches American dream. At the outset of their lengthy marriage, the Turners were of modest means. Then, they combined their enterprising spirit with creativity and determination to create BSL, a very profitable business. By 1996, BSL had gross earnings of $3,000,000 and approximately 25 employees. In the litigation at issue here, Ms. Turner, a minority shareholder of BSL, sought equal ownership and control of the Company.

The circuit court conducted two separate trials, one in November 1999 and the other in March 2000, "in a consolidated fashion." By agreement, the evidence adduced at one trial was considered as evidence in the other case.

Throughout the duration of these cases, the circuit court issued numerous written opinions, including three that are of particular importance here. The first, issued just after the divorce trial, is reflected in a seven-page Order docketed December 16, 1999. It addressed the matters of temporary alimony pending final disposition of both cases, as well as attorneys' fees. The second, issued on April 17, 2000, is a Memorandum Opinion addressing the corporate claims (the "Corporate Opinion"). The third is a Memorandum Opinion of June 9, 2000, regarding the divorce case (the "Divorce Opinion"). The court's rulings in the Divorce Opinion are reflected in the Judgment of Absolute Divorce docketed on July 19, 2000, by which appellant was granted a divorce on the ground of adultery, ending her marriage to appellee of more than thirty years.[2]

Unhappy with the court's resolution of both cases, Ms. Turner noted this appeal, in which she presents us with a dozen issues. Appellees have moved to dismiss the appeal, claiming that Ms. Turner cannot pursue any of her claims

---

otherwise, our use of the term "the parties" refers to Mr. and Mrs. Turner, exclusive of BSL.

2. By Order dated July 23, 2002, we remanded the cases to the circuit court for entry of a final judgment disposing of the corporate case, in compliance with Maryland Rule 2–601. The cases are now ready for resolution.

because she accepted payment of the monetary award in the divorce case.

We have rephrased slightly and reordered appellant's twelve questions, as follows:

I. Did the trial court err in attributing $35,000 in annual income to appellant in its determination of alimony?

II. Did the trial court err or abuse its discretion in awarding appellant $2,000 per month in indefinite alimony?

III. In awarding alimony, did the trial court err in failing to consider the parties' agreement of August 1997?

IV. Did the trial court err in denying appellant's claim for contribution with respect to the mortgage payments for the marital home?

V. Did the trial court err in finding a dissipation by appellee of only $112,000?

VI. Did the trial court err in its award of counsel fees to appellant and in construing the alimony *pendente lite* as a partial contribution to counsel fees?

VII. Did the trial court err in denying appellant's request for an accounting as a shareholder of BSL?

VIII. Did the trial court err in denying appellant's claims for corporate relief based on the doctrine of "unclean hands"?

IX. Did the trial court err in failing to grant appellant ownership of fifty percent of BSL?

X. Did the trial court err in refusing to disregard the corporate entity?

XI. Did the trial court err in regard to appellant's claim for wrongful discharge by BSL?

XII. Did the trial court err in limiting appellant's right to inspect and copy BSL documents?

For the reasons that follow, we shall deny appellees' Motion to Dismiss. With respect to appellant's contentions, we shall affirm in part, reverse in part, and remand for further proceedings.[3]

---

3. Although we do not agree with the trial court as to the disposition of every issue, we recognize that there were numerous opinions rendered

## FACTUAL AND PROCEDURAL SUMMARY

The divorce case was filed on July 15, 1997, initially on the ground of desertion. It was later amended to allege adultery. The corporate suit, filed on the same date, was also amended. The "Second Amended Complaint for Injunction and Other Relief," at issue here, was filed against both BSL and Mr. Turner and contains twelve counts.[4] Ms. Turner alleged, *inter alia*, that Mr. Turner misappropriated corporate funds to finance his drug habit, for which she sought various remedies in her capacities as stockholder and employee. She also claimed an equitable ownership of a 50% interest in BSL.

Evidence relating to the divorce case was heard over several days in November 1999, with closing arguments presented in April 2000. Evidence as to the corporate case was presented in March 2000. As we noted, the evidence from one trial was considered as having been admitted at the other trial. After the trials, the court issued a formal Order of Consolidation, dated June 5, 2000, consolidating the cases "for all purposes."

---

by the court and commend the trial judge for her thorough and well written opinions in regard to this legal morass.

4. In particular, Count I sought money damages against Mr. Turner as an officer and director of BSL. In Count II, appellant sought to enjoin Mr. Turner's continued diversion of BSL funds. Count III sought an accounting against appellees for the monies allegedly diverted by Mr. Turner from BSL. In Count IV, appellant sought money damages for the improper diversion of corporate funds. Count V sought money damages against appellees for the wrongful discharge of Ms. Turner by BSL and Mr. Turner. Count VI sought a judgment declaring Ms. Turner the owner of 50% of BSL. Count VII claimed damages for breach of contract. In Count VIII, appellant sought specific performance of the Agreement executed by the Turners in August 1997, which provided for payment of equal salary to the parties by BSL, and oversight by Ms. Turner of the BSL bank accounts. Count IX, a derivative action, sought money damages for the funds diverted by Mr. Turner from BSL. Count X, a derivative claim, complained of Mr. Turner's breach of fiduciary duty. Count XI sought an accounting as a derivative action. Count XII, a derivative action against Mr. Turner, sought damages for constructive fraud. Counts I, III, V, and XI were dismissed before trial.

BSL also filed a counterclaim that was addressed in the court's order of June 13, 2000. It is not at issue here.

In light of the consolidated format, our factual summary is derived from evidence adduced at both trials.

The Turners met in high school and were married on October 28, 1966, when Ms. Turner was eighteen years of age and Mr. Turner was nineteen years old. Their only child, Paul, was born in May 1967. Early in the marriage, Ms. Turner held various jobs with companies like McCrory's, while Mr. Turner was in the armed services and then began working at Burrough's. After thirty-one years of marriage, the couple separated in June 1997. At the time of the trials, they were in their early 50's, and generally in good health. Appellant, however, has had a history of sight problems dating from childhood, and has been a heavy cigarette smoker since she was a teenager, consuming three packs a day.

Appellee's interest in lighting began when he was a youngster, but his hobby did not generate income until 1970, when he created a "light box" that he sold. While working full-time at another job, Mr. Turner devoted his evenings to the development of a lighting business. As the interest in concert lighting generally escalated, the business began to prosper. By 1974, it had grown so much that appellee began to work for it on a full-time basis. The business evolved into BSL, which incorporated on August 6, 1976.

Although Mr. Turner became the president of BSL, it is undisputed that Ms. Turner was actively involved in BSL from its inception, and worked full-time in the business for many years. Indeed, she initially performed many of the same tasks as her husband, such as loading equipment and setting up stage lighting. Over the years, however, she became increasingly involved in management and finance, while appellee pursued technical matters. By 1994, appellant began to handle many of her financial responsibilities from home.

While both parties devoted considerable time and effort to BSL, appellee was paid a significantly higher salary than appellant. Moreover, Mr. Turner owned 65 shares of BSL stock, while only 10 shares were titled to appellant. Ms. Turner testified that she periodically discussed with appellee

her desire to hold title to an amount of BSL stock equal to his. She claimed that appellee assured her that they had an "equal" interest in BSL, and "it didn't make any difference" how the stock was titled. Although Mr. Turner did not specifically recall such conversations, he did not dispute that he may have made such remarks.

As BSL prospered, the parties enjoyed a standard of living commensurate with the Company's success. The parties purchased their marital home in Mt. Airy in 1991 for the sum of $349,000. Thereafter, they made substantial improvements to it, at a cost of about $223,650. The fair market value of the home was in dispute at trial, with expert valuations ranging from $380,000 to $475,000.

Appellant claimed that she and her husband devised a financial plan in 1996, by which they intended to pay off the mortgage on their home by January 2000, so that they could reduce their financial burden and spend more time on recreation. To accomplish their objective, they made additional payments of mortgage principal each month.

Ms. Turner recalled that problems in the marriage surfaced in 1995, when she noticed that Mr. Turner was coming home less frequently. By 1996, she suspected that he was involved with drugs and other women. Ms. Turner's concerns were confirmed in January 1997, when she discovered that appellee was using cocaine and had a relationship with another woman. Appellant also learned on June 9, 1997, that appellee had been removing cash from BSL. Soon afterwards, the parties separated.

On August 10, 1997, the Turners executed an Agreement providing for the payment to appellant of a weekly salary from BSL of $2500, and a reduction of Mr. Turner's salary to the same amount, $2500 per week. They also agreed to the payment of equal Company bonuses. Although BSL apparently paid for appellee's car, insurance, gas, and cellular telephone, appellant did not receive comparable benefits. Further, the Agreement contemplated Ms. Turner's continued involvement in BSL, because she was to have access to certain

financial records of the Company in order to complete the Company's tax returns for 1994, 1995, and 1996.

Following a *pendente lite* hearing before the master in December 1998, the terms of the Agreement were, in effect, incorporated into an Order dated December 11, 1998.[5] Mr. Turner was ordered to pay $2756.61 per week in alimony, effective August 1, 1998, which represented $2500 per week in alimony, comparable to the salary expressed in the August 1997 Agreement, plus a *pro rata* weekly portion of an additional monthly payment of $1112 for prepayment of principal on the mortgage. The mortgage payments were to be made by appellant.

At trial, Ms. Turner admitted that from 1976 until 1994 both parties diverted funds from BSL for personal use, and to pay some BSL employees "under the table." Appellant claimed, however, that the practice originated with appellee. Although the monies were not recorded on BSL's books, Ms. Turner kept records of the diverted funds, so that she would be able to account for the monies in case they were caught by the Internal Revenue Service ("IRS"). The Turners referred to these funds as "NC" money, meaning "not claiming."

When a former BSL employee threatened in 1994 to disclose the parties' conduct to the IRS, the Turners decided to terminate this practice. Ms. Turner maintained that she was unaware that appellee had resumed the "NC" practice until the parties separated in June 1997. At that time, she found a folder marked "NC" in appellee's office, and learned that Mr. Turner had resumed the illegal activity in 1995. Accordingly, appellant demanded an accounting of the monies appellee had taken, and an amount equal to what he took. She also threatened to report appellee to the IRS if he failed to comply.

By March 1999, appellee conceded that he had taken NC funds of approximately $112,000 from BSL. By then, howev-

---

5. In the Court's Order of December 16, 1999, the court said that this hearing occurred in December 1997. The docket entries and the Order indicate that the hearing was held in December 1998.

er, appellant had already reported her husband's actions to the IRS. Anticipating that his wife would make good on her threat, appellee also informed the IRS of what had transpired. Consequently, Mr. Turner paid back taxes, penalties, and interest.

When the parties separated, appellee withdrew $48,000 from the parties' joint account, leaving an equal amount for appellant. Appellant responded by writing a check to herself for approximately $30,000, drawn on BSL. She justified her conduct by claiming she was attempting to prevent appellee from using Company money for drugs. At trial, appellee took the Fifth Amendment when questioned about the $48,000, and when asked about the $112,000 that he had taken in NC monies. He also declined to explain fully the use to which he put the money that he diverted from BSL.

The parties presented expert evidence at trial as to the value of BSL. Andrew R. Lombardo, who testified for appellee, valued the Company at $810,799 as of December 31, 1998. Appellant's expert, R. Christopher Rosenthal, appraised the Company at $1,081,310 as of the same date.

With respect to appellant's claim for alimony, she insisted that she should not have to find new employment, arguing that it is unfair for appellee to harvest all the benefits of their joint labor with respect to BSL, while she is forced to start over again. The following testimony is relevant:

[APPELLANT'S ATTORNEY]: What is it that you are seeking in these proceedings other than a divorce?

[APPELLANT]: Equality as far as income from our company.

[APPELLANT'S ATTORNEY]: What, if any, objection do you have to going out and getting a job now?

[APPELLANT]: I feel that after 25 years I paid my dues, and did, and, if he can stay [at BSL] and continue to reap the benefits of my efforts over 25 years, and I have to go and start all over again, it's just outrageous.

* * *

[APPELLEE'S ATTORNEY]: Since your separation you have never tried to get employment; is that correct?

[APPELLANT]: That's correct.

* * *

[APPELLEE'S ATTORNEY]: And the reason given the Master was that you have your own company. That was what you told her[?]

[APPELLANT]: Yes. I believe I am still part of this company.

[APPELLEE'S ATTORNEY]: And you don't feel that you are capable of working because it would be very difficult to work for someone else after working for yourself for so long, correct?

[APPELLANT]: I believe for some people it would be.

[APPELLEE'S ATTORNEY]: It would be hard for you to take directions from someone else[?]

[APPELLANT]: Yes. I'm used to giving directions.

[APPELLEE'S ATTORNEY]: And there are no other reasons why you're not capable of being employed other than that reason, correct, ma'am?

[APPELLANT]: As far as I know.

Lee Mintz, a certified rehabilitation counselor, testified as an expert for appellee. She completed an "employability assessment" of Ms. Turner and conducted a labor market survey. Premised upon Ms. Turner's work history and the survey, Ms. Mintz opined that Ms. Turner was employable and capable of earning a salary of about $35,000 per year. The following testimony of Ms. Mintz is noteworthy:

[MINTZ]: ... I was asked to determine Ms. Turner's employability and also to determine the salary that she would be able to earn given her skill, experience, etcetera.

\* \* \*

[A] labor market survey was performed of positions, recently advertised positions, that would encompass duties that were similar to the types of duties that [Ms.] Turner performed in her position and then salaries were named for those positions.

\* \* \*

[APPELLEE'S ATTORNEY]: Now based on your expertise in this area and based upon your interview of [Ms.] Turner and the market survey that you performed, do you have an opinion based upon reasonable certainty in the vocational area as to whether or not [Ms.] Turner is employable at this time?

[MINTZ]: Yes. I believe she's employable.

[APPELLEE'S ATTORNEY]: And upon what do you base that opinion?

[MINTZ]: I base it upon her over twenty years of experience in clerical positions and supervisory positions, her indicated skills and knowledge of accounts payable, accounts receivable, payroll, human resources skills and her knowledge of computer—different computer programs that are used in the area, her knowledge of not only just the programs but training people in computers and installing programs. She seemed to have wide skills and experiences.

\* \* \*

[APPELLEE'S ATTORNEY]: Now, do you have an opinion, ma'am, based upon reasonable vocational certainty as to the range of salaries that would be applicable to [Ms.] Turner's job description were she to return to the work force?

[MINTZ]: Well, I would feel that her—the salary range would probably go anywhere from around $30,000 up into the low $40,000's probably with an average of about $35,000.

[APPELLEE'S ATTORNEY]: What type of position would you believe that she would be best suited for at this time?

[MINTZ]: Given everything she's done before, I would say an accounts payable, accounts receivable or payroll supervisor. Probably a job that incorporates some human resources, office knowledge. Maybe some office administration.

[APPELLEE'S ATTORNEY]: Ma'am, do you have an opinion based upon your expertise, the interview and your market survey and based upon reasonable vocational certainty as to what [Ms.] Turner would be able to average per year were she to return to the work force and employment that you have just described?

[MINTZ]: I feel that she would be able to earn an average salary of $35,000 per year.

Copies of the parties' federal and State tax returns were introduced in evidence, some of which were amended returns. In 1994, the Turners had an adjusted gross income of $243,007, including wage income of $238,050. Their adjusted gross income increased to $282,301 for 1995, inclusive of wages of $276,245. For 1996, the parties had an adjusted gross income of $299,276, with reported wages of $283,449. For 1997, the year when the parties separated, Mr. Turner filed a separate federal tax return in which he personally reported total income of $199,853, inclusive of a salary of $192,260. In August of that year, BSL began to pay appellant $2500 per week, pursuant to the parties' Agreement. Appellee subsequently made alimony payments, in the same amount, through 1999. Thus, the court found that for 1997, the parties' combined income exceeded $300,000. In 1998, Mr. Turner again filed a separate federal tax return. In that year, appellant received $2500 per week from BSL, and Mr. Turner reported total adjusted income of $138,712; his BSL wages were $139,450.[6]

---

6. As we shall discuss, *infra*, appellee's wages surged to $263,763.15 for 1999, according to his federal Form W–2, which was submitted by appellant in connection with her post-trial motion to alter or amend the judgment. We note, of course, that appellant's W–2 for 1999 was not yet available as of the trial in November 1999.

At trial, appellant claimed current monthly expenses of $12,341, inclusive of monthly legal and accounting fees of $3567 generated by the underlying litigation, and monthly mortgage payments of $2951. Appellant detailed her expenses in an exhibit that listed items ranging from groceries to pet supplies. The exhibit indicated that, once the marital home was "paid off," appellant's expenses would decrease to $9976. Further, without legal and accounting fees associated with the litigation, her expenses would decrease to $6409. Appellee claimed "projected" monthly expenses of $7410.50, and current monthly expenses of $5504.55.[7]

Following the divorce trial in November 1999, the court held the matter *sub curia,* pending resolution of the corporate case, then set for trial in March 2000. In the interim, based on the evidence adduced at the divorce trial, the court issued a seven-page Order docketed December 16, 1999, addressing the issues of temporary alimony and attorney's fees. Pursuant to the Order, the court reduced appellee's alimony obligation from $2500 a week to $2000 per week. The court also required appellee to contribute $1,112 per month "to the prepayment of the principal on the mortgage until that is paid in full," and one-half of the real property taxes when due. Further, the court found that appellant owed approximately $22,000 in attorneys' fees and expenses related to the litigation, and that there was "substantial justification" for these fees. Therefore, the court ordered appellee to make an interim payment of $6000 towards appellant's attorneys' fees.

In setting the amount of interim alimony, the court considered the monthly expenses that appellant claimed at trial. It noted that at trial appellant projected average monthly expenses of about $13,000 through January 2000, when the mortgage on the marital home was expected to be satisfied. Of that sum, the court observed that there were significant

---

7. One key difference in the two expense statements submitted by appellee concerned his housing costs. He claimed a current housing expense for rent of $450, and a projected mortgage expense of $2,083.00.

legal and accounting fees associated with the "ongoing litigation," noting that appellant's expense statement "contemplates that [the] alimony payment will cover at least a portion of [the] ongoing legal bills." The court also pointed out that when the house is paid off, appellant's expenses will decrease to about $10,000 per month.

Upon review, the court completely disallowed $1551 of appellant's itemized expenses. It found other expenses "excessive," and reduced them from about $1822 to $1200. In sum, the court rejected about $2100 of appellant's claimed monthly expenses. By a "Ruling" filed on February 1, 2000, the court denied appellee's motion to alter or amend, and obligated BSL to pay a bonus to appellant for 1998 equal to appellee's bonus.

In its Corporate Opinion of April 2000, the court denied the claim for declaratory relief, declined to grant a constructive trust or to disregard the corporate entity, found no grounds for estoppel, and denied the remaining counts based on the doctrine of "unclean hands." Therefore, the court ruled in favor of Mr. Turner as to all pending counts (Counts II, IV, VI, IX, X and XI).

In the Divorce Opinion of June 2000, the trial court valued the Turners' marital property at $1,555,821.85, of which $488,930 was joint marital property. The court found that Mr. Turner had total assets worth $1,193,465, while Ms. Turner had total assets valued at $360,664. The court then made an "equitable" award to appellant of 55% of the total marital property, amounting to $855,702. Therefore, the court made a monetary award to appellant of $495,038.[8] Appellant was also

---

8. Mr. Turner's assets of $1,193,465 consisted of property titled to him in the amount of $950,692.85 plus one half of the joint property (½ of $488,930 = $244,465; $950,692.85 + $244,465 = $1,193,465). Ms. Turner had property in her name valued at $116,199. Together with her half of the joint property, she had total assets of $360,664.

Fifty-five percent of $1,555,821.85 equals $855,702, the marital award to appellant. The court then subtracted appellant's property ($360,664) from her share of marital property ($855,702), to arrive at the monetary award to appellant of $495,038.

awarded $21,792.71 from Mr. Turner's pension to equalize the retirement funds.

With respect to the value of marital property, the court determined that the family home was worth $440,000. The court ordered its sale, with the proceeds to be divided between the parties. The court did not award appellant any credits for the mortgage and real estate tax payments she had made.

In arriving at the value of BSL, which was the largest component of marital property, the court considered the testimony of the experts and found as the "more reliable method" of valuation the "Excess Earnings (Return on Assets) Reasonable Rate" method utilized by appellee's expert. Before the application of any discounts, the court valued BSL at $1,158,285. Noting that the "real issue is what if any discounts" to apply, the court determined that the defense's marketability discount was excessive, and considered a 20% discount as "a fair assessment." To arrive at the fair market value of appellant's interest, the court applied another discount of 20% to her shares, based on her lack of control over routine operations at BSL, and her "restrict[ion] to a role as an investor in the business." The court valued appellee's BSL stock at $806,166, and appellant's BSL stock at $96,369.

The court also found that appellee dissipated $112,000 by diverting that sum from BSL. Thus, it attributed that amount to appellee. In making that finding, the court noted that appellee had acknowledged taking $112,000 as NC money, and observed that "Mr. Turner asserted his Fifth Amendment privilege when questioned about the manner in which those funds were taken or utilized. . . ." Thus, it said: "[T]he Court is permitted to draw adverse inferences, and will consider that money as extant property, attributable to Mr. Turner, which was used by him."

Nevertheless, the court did not attribute to appellee the legal, tax, and accounting fees generated by the NC misappropriation, which were primarily paid by BSL. Moreover, the court did not attribute to appellee as dissipated marital property any of the $48,950 that he withdrew from the parties'

joint bank account in June 1997. Appellee had explained his use of about $34,000 of that sum, and invoked his Fifth Amendment rights as to the remaining $14,950.

The court also concluded that neither party had any physical or mental condition that "restricts his or her ability to be gainfully employed." Determining that Ms. Turner is "employable," the court imputed to appellant earned annual income of $35,000, consistent with the opinion of appellee's expert.

Further, the court found that, prior to the separation, appellee was earning $3000 per week from BSL, plus an annual bonus, totaling about $160,000 per year, while Ms. Turner was paid about $1500 a week from BSL, plus a bonus, totaling about $80,000 to $85,000 a year. Moreover, the court found that for 1997, the year in which the parties separated, they had a combined annual salary of $302,770. Significantly, the court said: "Although Mr. Turner reported a drop in his 1999 salary to $130,000, the Court believes his actual earnings will more likely range between $175,000 and $200,000, and his earning potential is likely to continue to increase." Of equal import, the court explained why Mr. Turner's income had declined for that year, stating: "The Court notes that throughout 1999, Mrs. Turner continued to be paid by BSL at the rate of $2500 per week, pursuant to pendente lite orders, which undoubtedly affected the amounts Mr. Turner could draw in salary from the business." The court added that "it is clear that BSL is financially sound."

Based on the court's finding as to appellee's current earnings from BSL ($175,000 to $200,000 per year) and the potential annual earned income attributed to appellant ($35,000), the court found "a significant disparity" in the parties' incomes for purposes of alimony. Recognizing "that this was a marriage of long duration," in which the parties enjoyed "financial success and security ....," the court expressly determined that the parties' standards of living "will be unconscionably disparate, when considered in light of the standard of living that the parties worked to achieve and have jointly maintained

during the marriage." Therefore, pursuant to Maryland Code (1999 Repl.Vol.), § 11–106(c) of the Family Law Article ("F.L."), the court awarded Ms. Turner indefinite monthly alimony. However, it reduced the amount of alimony from $2000 a week to $2000 a month.

With respect to the determination to award indefinite alimony, the court reasoned that appellee's "career path is set, and will continue to prove lucrative," while appellant's "earning potential ... has been significantly reduced," because the divorce "derailed [her] from her career." Thus, the court concluded that the divorce "severely impacted [appellant's] day to day life." It also determined that, "at this stage of appellant's life there is no suggestion that additional training is going to increase her marketability."

As we observed, at various times during the litigation, appellant had previously received between $2000 and $2500 per week, either as salary from BSL or as alimony from appellee. In arriving at the alimony award of $2000 per month, the court considered appellant's assets, the monetary award, and the income that the monetary award was expected to generate. The court did not specify, however, the amount it believed the monetary award would reasonably yield as a supplement for appellant's support.

Further, the court ordered Mr. Turner to contribute $13,000 towards Ms. Turner's attorneys' fees, in addition to the $6000 that had been awarded in December 1999. The Divorce Opinion also included a section titled "Clarification of Rulings on Corporate Claims," in which the court addressed certain aspects of the corporate suit, previously addressed in its Corporate Opinion, to "avoid any uncertainty."

The Judgment of Absolute Divorce, filed on July 19, 2000, incorporated the terms of the Divorce Opinion. Pursuant to the divorce decree, $150,000 of the monetary award was to be paid to appellant within 45 days of the date of judgment, and the balance was due within six months, without interest. Both sides timely moved to alter or amend judgment.

In appellant's post-trial motion, filed on July 25, 2000, appellant complained, *inter alia*, about the amount of the alimony award, the amount of money that the court found appellee to have dissipated, the court's failure to award "Crawford" credits, and the award of attorneys' fees. Appellant also argued that the court erred in finding that appellee's current income was in the range of $175,000 to $200,000 per year. Further, she complained that the court placed "undue emphasis" on the amount of the monetary award in determining the alimony award. In regard to the amount of monthly alimony, Ms. Turner submitted a copy of appellant's W–2 Form for the 1999 calendar year, which was not available at the time of the divorce trial in November 1999. It showed that Mr. Turner had a gross income for 1999 of $263,763.15.

In addition, appellant pointed out that the "full expenditures" for the marital home would continue until the sale was completed on July 31, 2000. Asserting that "this Plaintiff of 34 years of marriage" faced considerable hardship, appellant pointed out that she had just been mandated to obtain employment, but did not yet have a job. Moreover, she noted that no payment of any portion of the monetary award was due for 45 days following the date of judgment. Appellant thus claimed a monthly shortfall of about $4000 between the alimony of $2000 a month and her necessary monthly expenses.

On July 31, 2000, settlement was held with respect to the sale of the marital home. The records reflect that parties each received net proceeds of about $150,000.

Also on July 31, 2000, appellee moved to alter or amend, claiming, *inter alia*, that the court erred in failing to find as extant property the unauthorized withdrawal of $30,000 in BSL funds, made by appellant at the time of separation. In addition, on August 14, 2000, appellee filed a "Response To Plaintiff's [appellant's] Motion to Alter or Amend Judgment, Or In The Alternative, Motion For New Trial." In his response, appellee did not dispute the accuracy of his income as reflected on his 1999 W–2, nor did he assert that the court should not consider his 1999 income in its alimony determina-

tion. Moreover, appellee did not claim that he had to borrow money to finance the monetary award, nor did he refer to the distribution to the parties of proceeds from the sale of the marital home. Rather, appellee said, in pertinent part:

The amount of alimony awarded by the Court was made after due consideration of the monetary award, wife's interest in jointly held property as well as wife's continued interest in Baltimore State Lighting, Inc. It amply reflects the reasonable expenses of E. Diane Turner and her absolute employability.

No hearing was held on the post-trial motions. By Order of September 20, 2000, the court corrected the monetary award, increasing it to $500,588 because of a miscalculation with respect to the parties' burial plots. In all other respects, the court denied the motions. In its opinion, the court explained that it "fully considered" the matter of Crawford credits, and therefore it declined to modify its prior ruling as to that issue. Concerning the amount of alimony, the court said:

Ms. Turner also seeks to review the amount of alimony that was awarded, contending that it is inadequate to meet her needs. In particular, she argues that the Court accorded undue weight to the marital award in determining the amount of alimony. Under FL § 11–106, that was a factor that was considered, but it was not the only factor. It should be noted, however, that the amount of the marital award also clearly impacts on Mr. Turner's financial needs and resources as it is predicated primarily on the differential in the value of the BSL stock owned by each party. While this stock is an asset of significant value, it is not one that can be sold or liquidated. This was another fact to be considered in evaluating the financial circumstances of the parties, in light of the marital award, when considering alimony. The factors under the statute were weighed and evaluated by the court when alimony was awarded at the time of the original ruling, and will not be reconsidered at this time.

On September 2, 2000, appellee made a partial payment of $70,000 to appellant with respect to the monetary award, leaving a balance of $80,000 on the first portion of the award, due on September 5, 2001. Shortly thereafter, appellant filed a "Notice of Non Payment and Request for Entry of Judgment Nunc Pro Tunc," seeking to obtain the balance due on the first portion of the monetary award. In addition, she filed a contempt petition in September 2000, which largely concerned corporate issues, but also asserted that, "[d]espite the sale of the family home and Mr. Turner's receipt of $148,644.00 from the sale of the family home on July 31, 2000, Mr. Turner paid the [wife] only $70,000.00 leaving $80,000.00 unpaid." On September 26, 2000, the court entered judgment against appellee for $80,000. The Clerk subsequently issued a Writ of Garnishment against appellee for collection of the judgment.

Appellant filed her appeal on October 13, 2000. Thereafter, on November 9, 2000, she filed a contempt petition against appellee for the $80,000 due and owing on the first portion of the monetary award. In addition, she averred that, as of November 8, 2000, appellee had "refused to pay the alimony due November 1, 2000 despite the request of [wife's] counsel ... and a personal request by the [wife]...." The court entered a Consent Order on December 19, 2000, continuing the contempt proceedings and ordering discovery.

Appellant filed another contempt petition on January 16, 2001, in relation to discovery. Thereafter, a judgment was entered against appellee on February 9, 2001, for $350,588, representing the balance of the monetary award due and owing to appellant. On May 9, 2001, approximately ten months after the judgment of divorce was docketed, and about seven months after appellant noted her appeal, Mr. Turner satisfied his obligations as to the monetary award by payment of $361,249.72.

We shall include additional facts in our discussion.

## DISCUSSION

### I. MOTION TO DISMISS

Appellees have moved to dismiss the entire appeal, claiming that appellant is barred from challenging any aspect of the judgment. They contend that, before and after filing her appeal, Ms. Turner "judicially" sought to enforce the divorce decree by filing three contempt petitions. Because appellant "pursued" and "collected by judicial enforcement" a monetary award in excess of $500,000, appellees argue that appellant "cannot now attack any element of the judgment." Relying on *Chimes v. Michael,* 131 Md.App. 271, 748 A.2d 1065, *cert. denied,* 359 Md. 334, 753 A.2d 1031 (2000), they argue that appellant "is estopped from seeking to question the validity of the Court's judgment as to all issues. . . ." Interestingly, appellees did not contend that appellant did not need the monetary award for support.

In her opposition, appellant observes that Mr. Turner did not cross-appeal. Thus, she asserts that "the right to the marital award benefit received is conceded by the Appellee. . . ." Ms. Turner also argues that she is not barred from pursuing her appeal because she needed to accept the money from the marital award for "necessary support."

At the time of the divorce decree, appellant was unemployed. Indeed, at that point, the court had just ruled that she was employable, but she had not yet secured employment. She also explains that the court reduced her alimony from $2000 a week to $2000 a month because it believed the marital award would generate sufficient income for her support. Based on Mr. Turner's refusal to pay the monetary award when due, however, appellant maintains that she had "little or no income generated." Indeed, she claims that she was "forced to invade her principal from the marital award to supplement" the court's reduction in her alimony, adding: "The monetary award monies *had* to be paid in order to

provide the bare minimum necessary support monthly to Ms. Turner until the final adjudication by the Appeals Court."

In her brief, Ms. Turner argues:

The Court's ruling on alimony clearly notes that in determining to award alimony of only $2,000.00 *per month,* ... the Court was particularly considering the amount of the monetary award and the estimates provided [as to] the income stream that those assets would generate for Mrs. Turner.... Income from investments to Mrs. Turner of between $68,000.00 and $82,000.00 were necessary to meet the standard of living that the parties had worked so hard to achieve and had jointly maintained during their marriage.

Accordingly, the receipt of the marital award funds and the income hopefully produced by those funds was therefore *necessary* for Mrs. Turner to apply towards her day-to-day living expenses....

\* \* \*

*To extend the acquiescence doctrine as Mr. Turner has requested in this Motion where Mrs. Turner needed income from the investments to meet her living expenses would be a travesty of justice....* The monetary award monies had to be paid in order to provide the bare minimum necessary support monthly to Mrs. Turner until the final adjudication by the Appeals Court.

We are guided by the Court of Appeals's recent decision in *Downtown Brewing Company, Inc. v. Mayor and City Council of Ocean City,* 370 Md. 145, 803 A.2d 545 (2002), a condemnation case. There, the Court dismissed the appeal because, "by its conduct," the appellant "waived" for appellate review the question of whether Ocean City had authority to condemn the property for use in a state highway project. *Id.* at 148, 803 A.2d 545. The conduct that led to the finding of waiver was the appellant's acceptance of the condemnation award, despite its challenge to the underlying proceeding. *Id.* at 146–47, 803 A.2d 545.

■ The Court recognized the "general rule" that " 'an appellant cannot take the inconsistent position of accepting the benefits of a judgment and then challenge its validity on appeal.' " *Id.* at 149, 803 A.2d 545 (citation omitted). As the Court noted, the "general preclusion has been variously termed as waiver, estoppel, acceptance of benefits creating mootness, and acquiescence in judgment." *Id.* Regardless of the label, " '[t]he right to appeal may be lost by acquiescence in, or in recognition of, the validity of the decision below from which an appeal is taken....' " *Id.* (quoting *Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531 (1966)). Such conduct is "inconsistent" with the right to appeal. *Id.*

Nevertheless, because the Court regards the doctrine as "a severe one," it has held that "it should only be applied to actions taken by the same litigant that are necessarily inconsistent and that a claim on appeal that one is entitled to more money is not inconsistent." *Id.* Of significance here, the Court expressly identified as an "exception" to the acquiescence rule those cases in which "the right to the benefit received is conceded by the opposing party or where the appellant would be entitled to the proceeds in any event." *Id.* at 150, 803 A.2d 545. In this regard, the Court cited *Dietz v. Dietz*, 351 Md. 683, 696–97, 720 A.2d 298 (1998), in which it denied a motion to dismiss the appeal in a domestic case when "only the amount of alimony awarded was contested." *Downtown Brewing*, 370 Md. at 150, 803 A.2d 545. The Court concluded, however, that the appellant in *Downtown Brewing* could not "shoehorn" itself into the exception, because its challenge was not confined to the sufficiency of an award. *Id.* at 151, 803 A.2d 545.

*Dietz*, 351 Md. 683, 720 A.2d 298, cited in *Downtown Brewing*, is instructive. In that case, the trial court ordered partial payment of a monetary award (i.e., $20,000) in thirty days, with the balance of $225,000 payable in monthly installments of $1,250 over a fifteen year period. *Id.* at 686, 720 A.2d 298. On appeal to this Court, the appellant sought an increase in the monetary award. We dismissed the appeal, however, based on the acquiescence doctrine, because the

appellant had accepted partial payments of the award. *See* Dietz v. Dietz, 117 Md.App. 724, 741, 701 A.2d 1144 (1997). The Court of Appeals disagreed and reversed. The Court said that, " '[i]f applicable at all in a divorce case, the [acquiescence] bar cannot be raised where the benefits accruing to the wife, by reason of the award, provide necessary support until the final adjudication of the case.' " *Id.* at 695, 720 A.2d 298 (citation omitted).

For purposes of the acquiescence rule, the Court analogized the monthly award of payments to those made in workers' compensation, alimony, and condemnation cases. Moreover, the Court recognized that "the acquiescence doctrine 'is a severe one and should not be extended.' " *Id.* (citation omitted). Noting that the appellee did not contest the monetary award, *id.* at 696, 720 A.2d 298, the Court said that *"the acquiescence rule does not apply where there is no cross-appeal and the appellant seeks only an increase in an undisputed minimum."* *Id.* at 695, 720 A.2d 298 (emphasis added).

Construing *Dietz*, the Court in *Chimes* observed that *Dietz* reached its conclusion based on the "alimony-like *effect* of a scheme of monthly payments, rather than on that scheme's actual nomenclature." *Chimes*, 131 Md.App. at 285, 748 A.2d 1065. *Chimes* is factually distinguishable from *Dietz*.

The appellant in *Chimes* accepted a monetary award of about $1.5 million, which represented 50% of the marital property, other than stock options. On appeal, the appellant challenged the court's disposition of the stock options. This Court dismissed the appeal, however, based on the acquiescence doctrine. We observed that appellant "accepted almost $1.5 million from the equitable distribution of marital assets and appeals the same." *Id.* at 281, 748 A.2d 1065. Indeed, we pointed out that he filed a statement of satisfaction under Maryland Rule 2–626(a) on the same day that he filed a second notice of appeal; the second notice was filed because the trial court had issued an amended judgment, giving rise to the second appeal. *Id.* Moreover, we concluded that "the large lump sum award already enjoyed by [the husband] does

not have the support-like effect of the payments made in *Dietz.*" *Chimes,* 131 Md.App. at 286, 748 A.2d 1065 (footnote omitted). We added: "*Dietz* is also distinguishable from the present case in that Mrs. Dietz only accepted a small portion of the judgment before she appealed. Chimes, in contrast, accepted the *entire* monetary award, even seeking to execute on its unpaid portions and filing a Notice of Appeal on the same day that he entered a line stating that the judgment had been satisfied." *Id.* (internal citations omitted).

■ In our view, the case *sub judice* is more akin to *Dietz* than to *Chimes* or *Downtown Brewing.* The trial court made a monetary award to appellant of $500,588.00, of which $150,000 was due 45 days after the judgment; the balance was not payable until six months from the date of judgment. As we have seen, however, appellee did not timely pay either portion of the monetary award. By the time of appeal, appellee had only paid $80,000 of the total monetary award, equal to less than 20% of the entire award. Thus, when Ms. Turner appealed, the monetary award was not yet paid in full. Indeed, the monetary award was not satisfied until May 9, 2001, about ten months after the judgment of absolute divorce was docketed. Thus, this case is altogether unlike the situation in *Chimes,* where the *entire* monetary award of $1.5 million was paid *before* the appeal at issue was noted.

Significantly, the court below substantially reduced appellant's alimony from $2000 a week to $2000 per month, expressly because it believed the marital award would generate an income stream for appellant's support; it clearly regarded the marital award as a significant component of appellant's support. The court said: "Both parties will leave this marriage with significant assets. *In particular, the Court is considering that amount of the monetary award in evaluating the issue of alimony. Estimates were provided of the income stream those assets will generate for Mrs. Turner.*" (Emphasis added).

Of particular import, appellees have not argued that appellant did not need the monetary award as a component of her

support. To the contrary, they have suggested that the alimony award was adequate precisely because of the income that the monetary award was expected to produce.

It is equally noteworthy that appellees did not file a cross-appeal challenging any aspect of the monetary award. As the Court said in *Dietz*, 351 Md. at 695, 720 A.2d 298, "the acquiescence rule does not apply where there is no cross-appeal and the appellant seeks only an increase in an undisputed minimum." That is precisely the situation here; appellant seeks an increase from an undisputed minimum of $2000 per month in alimony.

Even if, *arguendo*, the divorce case were not appealable, appellees have not suggested why this would foreclose the appealability of the corporate case. Indeed, appellees have not provided us with any authority to support their assertion that appellant's conduct in accepting the monetary award in the divorce case bars her from pursuing the appeal in the corporate case.

The court below consolidated the divorce and corporate cases after they were tried, but did not issue a unitary judgment. Moreover, in *Yarema v. Exxon Corp.*, 305 Md. 219, 503 A.2d 239 (1986), the Court recognized that, "unless the trial court clearly intends that a joint judgment be entered disposing of all cases simultaneously," *id.* at 236, 503 A.2d 239, consolidated cases are generally not treated as one case for the purpose of Rule 2–602. "[I]nstead, each one of the cases is to be treated as *a* separate action." *Id.*

For all these reasons, we shall deny appellees' motion to dismiss.

## II. Attribution of Income to Appellant

As the court noted in its Order of December 16, 1999, appellant had "no intention to seek employment, and her only source of revenue has been alimony payments." Moreover, appellant believed she had "paid her dues." Nevertheless, the court imputed earned income to appellant of $35,000. In so doing, Ms. Turner complains that the trial court erred. Ap-

pellant argues that it was grossly unfair for the court "to essentially force [her] to get employment, inevitably as a start-up employee" given the length of the parties' marriage, her age, contributions to BSL, and appellee's egregious conduct.

■ This contention shall not detain us long. Appellant conflates the court's finding of employability, for which it attributed income to appellant for purposes of the alimony analysis, with the view that the court has *forced* her to obtain employment outside the home. As we see it, the court's finding that appellant is capable of employment does not mean that she must actually obtain employment. Put another way, appellant has not been driven into the marketplace, as she seems to suggest; whether appellant actually chooses to obtain employment remains entirely up to her. Nevertheless, appellant is clearly employable, given her age, health, work experience, skills, and the absence of minor children in the home. Therefore, the court was more than justified in attributing potential earnings to appellant as a predicate to determining the appropriate amount of alimony.

■ Appellant did not offer evidence that contradicted the expert testimony of Lee Mintz, who opined that appellant is employable and could expect to earn an annual salary of about $35,000. It was clearly the province and responsibility of the court to assess and weigh the testimony of the witnesses. *See Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991); *Hill v. State,* 134 Md.App. 327, 355, 759 A.2d 1164, *cert. denied,* 362 Md. 188, 763 A.2d 735 (2000) ("Weighing the credibility of the witnesses and resolving any conflicts in the evidence are tasks proper for the factfinder.") The court was entitled to accept Mintz's testimony. *See Long v. Long,* 129 Md.App. 554, 570, 743 A.2d 281 (2000)(stating that the trier of fact must evaluate the conflicting testimony of expert witnesses and decide which opinion, if any, to accept).

### III. The Alimony Award

Appellant contends that, even if she is capable of earning $35,000 annually, the court abused its discretion in regard to

the *amount* of its monthly alimony award. Under the circumstances attendant here, she maintains that the alimony award of $2000 a month is "grossly inadequate."

Appellant advances several grounds to support her claim. In particular, she suggests that appellee earns substantially more than the court found, and therefore the court erred as to the annual income attributed to him for purposes of making its alimony determination. Further, while recognizing that she received a sizeable marital award, appellant asserts that the award merely "placed [her] long-term assets on a par with that of her husband." Appellant also complains of the inequity in being forced out of BSL, a business that she worked hard to develop, and of having to "start all over," with the attendant difficulty of finding suitable employment, while appellee is allowed to "reap the rewards" of their joint effort. Appellant is particularly disgruntled in light of appellee's conduct, which led to the dissolution of the marriage.

For his part, appellee argues that, in deciding the amount of alimony, the trial court properly considered the division of marital property and the income stream that appellant's share will inevitably generate. Appellee also relies on *Blaine v. Blaine*, 336 Md. 49, 646 A.2d 413 (1994), for the view that "the formerly dependent spouse ordinarily is not entitled to have his or her standard of living 'keep pace' with that of the other spouse after the divorce, or to share in the other spouse's future accumulations of wealth." *Id.* at 70, 646 A.2d 413.

■ Before focusing on the contentions raised by appellant, it is helpful to clarify what is *not* at issue. As we noted, the trial court found an unconscionable disparity in the parties' incomes and standards of living, and those findings have not been challenged by Mr. Turner. Similarly, appellee has not presented a claim of error or abuse of discretion in the court's decision to award indefinite alimony or with respect to the marital award. Thus, our sole focus here concerns the *amount* of the monthly alimony award. In analyzing the amount of the award, we are mindful of what the Court said in *Crabill v. Crabill*, 119 Md.App. 249, 704 A.2d 532 (1998):

"There is no bright line for determining the propriety of an alimony award...." *Id.* at 266, 704 A.2d 532 (citation omitted). Rather, each case depends upon its own circumstances " 'to ensure that equity be accomplished.' " *Id.* (quoting *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70 (1993)).

■ It is well settled that "the 'policy of this State is to limit alimony, where appropriate, to a definite term in order to provide each party with an incentive to become fully self-supporting.' " *Digges v. Digges,* 126 Md.App. 361, 386, 730 A.2d 202 (quoting *Jensen v. Jensen,* 103 Md.App. 678, 692, 654 A.2d 914 (1995)), *cert. denied,* 356 Md. 17, 736 A.2d 1065 (1999); *see Karmand v. Karmand,* 145 Md.App. 317, 327–330, 802 A.2d 1106 (2002). Accordingly, "Maryland's statutory scheme favors fixed-term, 'rehabilitative alimony' rather than indefinite alimony." *Innerbichler v. Innerbichler,* 132 Md. App. 207, 244, 752 A.2d 291, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000); *see Durkee v. Durkee,* 144 Md.App. 161, 174, 797 A.2d 94, *cert. denied,* 370 Md. 269, 805 A.2d 266 (August 23, 2002); *Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 142, 740 A.2d 125 (1999), *cert. denied,* 358 Md. 164, 747 A.2d 645 (2000). Rehabilitative alimony is intended to ease the transition from dependence to self-support. *Turrisi v. Sanzaro,* 308 Md. 515, 524–25, 520 A.2d 1080 (1987); *Innerbichler,* 132 Md.App. at 244, 752 A.2d 291. The goal is "to vitiate any further need for alimony." *Hull v. Hull,* 83 Md.App. 218, 223, 574 A.2d 20, *cert. denied,* 321 Md. 67, 580 A.2d 1077 (1990).

In the seminal case of *Tracey v. Tracey,* 328 Md. 380, 614 A.2d 590 (1992), the Court of Appeals explained:

[T]he purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently. Expressed otherwise, alimony's purpose is to provide an opportunity for the recipient spouse to become self-supporting. The concept of alimony as life-long support enabling the dependent spouse to maintain an accustomed standard of living has largely been superseded by the view that the dependent

spouse should be required to become self-supporting, even though that might result in a reduced standard of living. *Id.* at 391, 614 A.2d 590 (citations and quotations omitted).

■ The statutory scheme is codified in Title 11 of the Family Law Article. The statutory factors governing the award of alimony are set forth in F.L. § 11–106(b). *See Doser v. Doser,* 106 Md.App. 329, 355–56, 664 A.2d 453 (1995). Family Law § 11–106(b) states:

(1) the ability of the party seeking alimony to be wholly or partially self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; and

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any [monetary] award made ...;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement bene-
fits . . . .

Although "the court 'need not use formulaic language or
articulate every reason for its decision with respect to each
factor, [it] must clearly indicate that it has considered all the
factors.' " *Digges,* 126 Md.App. at 387, 730 A.2d 202 (citations
omitted).

■■ The General Assembly has recognized that rehabilita-
tive alimony is not always appropriate or suitable. Therefore,
the statutory scheme allows a trial court, in its discretion, to
ensure " 'an appropriate degree of spousal support . . . after
the dissolution of a marriage.' " *Innerbichler,* 132 Md.App. at
246, 752 A.2d 291 (quoting *Tracey,* 328 Md. at 388, 614 A.2d
590). In this regard, F.L. § 11–106(c) states:

(c) *Award for indefinite period.*-The court may award ali-
mony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party
seeking alimony cannot reasonably be expected to make
substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made
as much progress toward becoming self-supporting as can
reasonably be expected, the respective standards of living
of the parties will be unconscionably disparate.

■■ The party seeking indefinite alimony bears the
burden of satisfying the statutory criteria. *See Crabill,* 119
Md.App. at 260–61, 704 A.2d 532; *Doser,* 106 Md.App. at 353,
664 A.2d 453. Notably, "self-sufficiency per se does not bar
an award of indefinite alimony [under F.L. § 11–106(c),] if
there nonetheless exists an unconscionable disparity in the
parties' standards of living after divorce." *Tracey,* 328 Md. at
392–93, 614 A.2d 590. In *Roginsky,* 129 Md.App. at 146, 740
A.2d 125, this Court explained the relationship between F.L.
§ 11–106(c)(1) and (c)(2), stating:

Section 11–106(c) of the Family Law Article requires a
finding, under subsection (1), as to whether a party can
make substantial progress toward becoming self-supporting;
if not, that finding may justify a conclusion that alimony be

indefinite. If a court projects that a party will become self-supporting, subsection (2) provides that, if and when a party makes as much progress toward becoming self-supporting as can reasonably be expected, an award of indefinite alimony may still be justified if the standards of living will be unconscionably disparate. In other words, subsection (2) requires a projection into the future, based on the evidence, beyond the point in time when a party may be expected to become self-supporting. It requires a projection to the point when maximum progress can reasonably be expected.

■■■ Generally, the trial court's determination of unconscionable disparity under F.L. § 11–106(c) is a question of fact, subject to review under the clearly erroneous standard. *See Ware v. Ware,* 131 Md.App. 207, 228, 748 A.2d 1031 (2000). As we explained in *Ware:*

"The existence of 'unconscionably disparate' standards of living is a question of fact in the domain of the fact-finder. In fact, the *trial judge is given so much discretion on this issue that* [, until *Roginsky v. Blake Roginsky,*] *we have never reversed a trial court's award of indefinite spousal support* in a published opinion."

*Id.* at 229, 748 A.2d 1031 (citation omitted).

■■■■ In contrast, the alimony award itself is a matter within the discretion of the chancellor. *Blaine,* 336 Md. at 74, 646 A.2d 413; *Ware,* 131 Md.App. at 227, 748 A.2d 1031. Absent an abuse of discretion or legal error, we will not disturb the trial court's decision. *Tracey,* 328 Md. at 385, 614 A.2d 590; *Crabill,* 119 Md.App. at 260, 704 A.2d 532. *See also North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994) (discussing definition of abuse of discretion). To the contrary, " 'appellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings.' " *Ware,* 131 Md.App. at 227, 748 A.2d 1031 (citation omitted).

The court found that appellee "currently" earns between $175,000 and $200,000 from BSL, and that "his earning potential is likely to increase." Appellee has not disputed those

findings. To the extent that the court found that appellant currently earns $175,000 per year, or even $200,000 a year, the finding was not supported by the evidence. Among other factors, the propriety of the annual alimony award of $24,000 must be measured against the income appellee actually earns. *See* F.L. § 11–106(b)(9).

For 1997, the court found that the parties had a combined income in excess of $300,000. In 1998, appellee, individually, reported wages of approximately $140,000. It is fallacious, however, to construe appellee's 1998 earnings as an accurate measure of his economic position. As the circuit court noted in the Divorce Opinion, the amount appellee could draw in salary from BSL in 1998 was "undoubtedly affected" by the Company's obligation to pay $2500 per week to appellant pursuant to the Agreement, and appellee's subsequent court-ordered obligation to pay alimony in that amount. Indeed, even appellee does not assert that his income in 1998 represented a realistic picture of his earnings history or earnings capacity. Moreover, because appellee's corporate salary in 1998 ($140,000) was equal to appellant's salary pursuant to their Agreement, the parties' *combined* income from BSL in 1998 exceeded $260,000. Clearly, the court did not regard the $140,000 reported by appellee for 1998 as reflective of his actual earning capacity, given its finding that appellee earns between $175,000 and $200,000.

Appellee's W–2 for 1999, submitted without objection in connection with appellant's post-trial motion, merely corroborated that appellee's reported earnings for 1998 were aberrational. According to the W–2 for 1999, appellee earned a salary of $263,763 from BSL. That sum was consistent with the parties' earnings in 1995, 1996, and 1997, when their combined, adjusted gross incomes ranged from a low of $282,301 in 1995 to a high of over $300,000 in 1997.

Significantly, in light of the divorce, appellant no longer has to divide or apportion between himself and appellant the salaries previously generated by BSL for the two corporate employees who were also the only owners of the Company.

Put another way, appellee no longer has to share the monies previously paid to the parties in combined salaries. Because appellant no longer draws a salary from BSL, that money is now available to appellee, minus any cost of hiring someone to do the work that appellant once performed. Therefore, Mr. Turner can undoubtedly retain for himself a large portion of the $80,000 to $85,000 that appellant, individually, had been paid while the parties were married, or the $130,000 per year that appellant received pursuant to the Agreement and the *pendente lite* alimony order.[9]

It is clear, then, that the earnings that the court attributed to appellee (i.e., a range of $175,000 to $200,000) are not supported by the evidence. Rather, the court's finding that appellee earns between $175,000 and $200,000 is between $60,000 and $85,000 less than appellee's actual earnings or earnings capacity over the past several years. Based on the evidence, appellee could reasonably expect to earn about $260,000 annually from BSL. Moreover, as best we can determine, the earnings that the court attributed to appellee did not include the value of the benefits provided to him by BSL, such as a car, insurance, phone, and bonuses. It follows that appellee's current salary of about $260,000 exceeds appellant's imputed income of $35,000 by about $215,000, exclusive of her investment income, which we discuss, *infra*.

Even if we agreed with the court's income calculations for appellee of $175,000 to $200,000, our conclusion as to the court's alimony award would be the same. By the court's own analysis, appellee's income is quite substantial *and* likely to increase. Whether appellee earns $175,000, $200,000, or $260,000 a year, we believe the court erred and/or abused its discretion with respect to its alimony award. In reaching our conclusion, we rely, in part, on many of the court's own findings. We explain.

---

9. Even if BSL must hire someone to replace appellant, appellee's expert valued such work in the open market at about $35,000 a year. This is not to suggest that we have any view as to whether appellant was overpaid, given her status as the co-owner of a prosperous family business.

As the circuit court found, this was a marriage of considerable length, and it was appellee's "conduct [that] gave rise to the estrangement between the parties." Moreover, the court recognized that during their thirty-one years of marriage, both parties made "significant contributions" and devoted "substantial time and effort" to "the development of BSL from a fledgling company" to a significant corporate entity. The court found that appellant "was equally involved [with appellee] in the development of the business," adding that BSL "would not have been as successful had [appellee] not had the consistent support and assistance of Diane Turner." Nevertheless, as the court specifically found, Mr. Turner alone retains "the controlling ownership interest" in BSL; only he "remains enmeshed" in BSL, notwithstanding that "BSL has been as much [appellant's] career and a focal point for her interests ... as it was for her husband." Of particular import, the court expressly found that, as a consequence of the dissolution of the marriage, appellant "lost her career path ...," and now has an earning capacity of $35,000 a year.

The parties' lengthy mutual involvement in the lucrative family business distinguishes this case from others that suggest that, after divorce, a dependent spouse cannot expect to "keep pace" with the economic status of the person who was the primary economic provider during the marriage. *See, e.g., Blaine,* 336 Md. at 70, 646 A.2d 413. Although we do not suggest that appellant was necessarily entitled to economic parity upon divorce, we recognize, as did the circuit court, that this is a case in which *both* parties helped to create BSL, and appellant worked for the Company for almost 25 years. Yet, despite appellant's significant contributions to BSL and her length of service, the Company is now the source of substantial income *only* for Mr. Turner. While recognizing the length and value of appellant's efforts, the circuit court noted that Mr. Turner's "career path is set, and will continue to prove lucrative," but appellant has been completely "derailed."

In awarding appellant $24,000 a year in alimony, the court was of the view that the "significant assets" with which both

parties left the marriage would yield an adequate supplement to appellant's alimony and earned income. As noted, the court awarded appellant 55% of the marital property, which included the value of BSL. Appellee maintains that the marital award is sufficient to rectify any inequity in earnings, despite the fact that he received marital property of almost equal value.

As the trial court found, appellant played a vital role in helping the parties to amass their wealth. Yet, the almost equal division of the value of the Company hardly puts appellant on an equal footing with Mr. Turner. Appellee alone retains control of BSL, not merely 55% of its value, while appellant is no longer employed by the Company. Therefore, appellee alone will continue to benefit from the opportunity to maintain lucrative employment with BSL, annually drawing about a quarter of a million dollars in salary, benefits, and bonuses. In contrast, appellant must now decide whether to confront the uncertainties of the marketplace, in the hope of obtaining new employment that will likely yield an income that is less than half of what appellant earned in her own name while at BSL, and a fraction of what the couple earned collectively. While the parties were married, it was not particularly significant as to how they apportioned their salaries, because both benefitted economically from the success of the enterprise that they jointly formed.

At trial, Mr. Turner presented expert evidence from Jay Middleton, a financial planner, as to appellant's potential income from the investment of the monetary award. Of course, Middleton could not predict with certainty a precise rate of return on investments. Instead, he provided estimates of the potential annual income that the monetary award would yield, in increments of $100,000, based on different investment strategies.

Using a "conservative portfolio," Middleton indicated that an initial investment of $100,000 would permit a "periodic withdrawal" [10] of $11,400, while an initial investment of

---

**10.** It appears that the term "periodic withdrawal" refers to an annual withdrawal.

$500,000, with the same strategy, would permit an annual "withdrawal" of $57,000. Using a "balanced portfolio" approach, an initial investment of $100,000 would yield an annual "withdrawal" of $12,550, while an initial investment of $500,000 would yield a "periodic withdrawal" of $62,800. Finally, for an "aggressive portfolio," his report showed that an initial investment of $100,000 would allow an annual "withdrawal" of $13,500, while an initial investment of $500,000 would yield an annual "periodic withdrawal" of $67,500.

Significantly, the court made no finding of even a minimal yield that it anticipated from appellant's investments, so as to then calculate the amount of alimony it considered appropriate as a supplement for appellant's support. Instead, it relied on unspecified "estimates" of the "income stream" that appellant's share of the marital assets "will generate." Evidently, the court believed that appellant's investment income—whatever the amount—would prove sufficient to overcome the disparity in the parties' economic positions. Because the court did not indicate even a minimal amount of money that it believed appellant will have available to her from her investments to use towards her own support, it is not clear how the court arrived at its determination as to an appropriate alimony award. In other words, without any finding by the court of some amount of anticipated investment earnings, we do not know how the court determined to award appellant monthly alimony of $2000.[11]

As we indicated, F.L. § 11–106(b)(3) entitles the court to consider the standard of living that the parties established during the marriage. In order to live as appellant was accustomed during the marriage—a lifestyle that she helped

---

11. In general, assuming that appellant was in a position to invest the entire monetary award, and assuming further that her investments would yield the annual maximum amount of $67,500 estimated by Middleton, appellant would have a total *maximum* income of about $126,000 annually (i.e., $35,000 in imputed income + $24,000 in alimony + $67,500 in investment income). We do not know what assumptions the court made, however. Nor can we comment on the validity of unspecified assumptions.

the parties to achieve—the unassailable fact is that appellant must supplement her income by using money generated from investments. Middleton's testimony made clear that, unlike the alimony award of $24,000 and the earned income of $35,000, which are fixed sums, the amount of money that appellant can realistically expect to obtain from investments is by no means certain. Recent times have underscored the difficulty of predicting a yield on investments, and the challenges of relying on the stock market as a supplement to support. Indeed, the turbulent state of the stock market highlights the unpredictability of potential income from such investments, as well as the risks associated with them. Even cautious investors would not have anticipated that investments in companies like Enron or WorldCom could evaporate overnight.

Family Law § 11–106(b)(9) provides that, in regard to the alimony determination, the court must consider "the ability of the party from whom alimony is sought to meet" his own needs, along with the needs of appellant. Further, F.L. § 11–106(b)(11) obligates the court to consider the financial resources of both parties. In the context of this case, these provisions suggest that, in ascertaining the appropriate alimony award, the court should have considered the extent to which the anticipated growth of the parties' assets might be affected by their respective needs to use their assets to meet expenses. We explain.

Middleton's predictions varied with the size of the amount available for investment. Clearly, if appellant needed to use a portion of her investment income to meet current needs and expenses, this would impact on the growth potential of her investment assets; a reduction in the size of the investment corpus would affect the income stream that the monetary award can generate. The court did not indicate the portion of the monetary award that it believed appellant would be in a position to invest. In projecting the income stream for appellant's support, we cannot determine if the court considered whether or the extent to which appellant will have to use the corpus of the monetary award to meet her needs.

In contrast to appellant, because appellee's career remains intact, and he continues at the helm of a prosperous company, with a salary that far exceeds his expenses, it is unlikely that he will have to use investment income or invade the corpus of investments to meet current expenses. Instead, it appears that Mr. Turner will be in a position to maintain the corpus and reinvest the income generated by his investments, thereby adding to his wealth and widening the disparity in the parties' economic status. Again, it does not appear that the court considered that circumstance.

In its ruling with respect to appellant's post-trial motion, which we quoted earlier, the court amplified its reasoning as to the amount of alimony it awarded. It explained that the amount of the marital award "impacts on Mr. Turner's financial needs and resources as it is predicated primarily on the differential in the value of the BSL stock owned by each party." The court added that although BSL stock has "significant value," it cannot be readily "sold or liquidated." Considering Mr. Turner's annual salary, together with bonuses and benefits, we fail to understand the relationship between the lack of liquidity of BSL stock and an equitable alimony award.[12]

In any event, as F.L. § 11–106(b)(11)(i) recognizes, valuable assets are not necessarily liquid, nor are they necessarily of the type to produce periodic income. A house, for example, is a type of asset that may be very valuable, although it does not yield annual income. Its value may also appreciate over time. At the point of sale, homeowners generally hope to benefit from the appreciated value of the asset. Similarly, appellee's ownership of stock in BSL may not be liquid, but it is certainly valuable, and his investment may well appreciate and prove lucrative if and when appellee sells the Company.

---

**12.** In his brief, appellee asserted that because BSL stock is not liquid, appellee "would be required to obtain loans to satisfy the monetary award...." We have not found any evidence presented to the court below with respect to the need for or acquisition of a loan to pay the monetary award. Appellee's current monthly expenses listed a "Mass. mutual loan" payment of $180 per month.

As we said earlier, neither the issue of unconscionable disparity nor the decision to award indefinite alimony is before us. We are faced only with the issue of the propriety of the amount of the alimony award. The court below carefully explained its rationale for the finding of unconscionable disparity and for its determination to award indefinite alimony. We have searched for some rationale in the court's opinion to explain its determination to award appellant alimony in the amount of $2000 per month, in light of the particular circumstances of this case. In sum, what we found is that the court's decision was predicated on the general assertion that it considered the statutory factors; both parties "will leave this marriage with significant assets"; appellant will receive an undetermined "income stream" generated by her share of the assets; and appellee's stock in BSL, while "of significant value, . . . is not one that can be sold or liquidated."

Appellant is the one who has been deprived of an opportunity to continue to enjoy the sizeable economic rewards of working for BSL, while appellee will continue to work there, earning far more than appellant can ever hope to achieve. In light of all the circumstances discussed above, including the length of the marriage, the reasons for and consequences of the parties' estrangement, the wife's contributions to BSL, the couple's respective economic positions and financial resources, the undetermined amount of investment income that appellant can reasonably expect to earn from her share of the marital assets, and the court's reliance on an incorrect amount of earned income for appellee, we conclude that the court erred and abused its discretion in its award of indefinite monthly alimony in the amount of $2000. Therefore, we shall vacate the alimony award and remand for further proceedings.

On remand, the court may also want to revisit the matter of appellant's expenses in regard to the determination of the appropriate amount of alimony. It goes without saying that the less appellant had in expenses, the less alimony the court believed she needed. The court's findings as to expenses may have affected its determination as to appellant's alimony.

In its Divorce Opinion, the court specifically referred to its earlier Order of December 16, 1999, which was an opinion that the court issued after the divorce trial, based on the evidence adduced at the divorce trial. In the December 1999 opinion, the court "determined" that some of appellant's expenses "are not reasonable and should not be considered in determining Mrs. Turner's financial needs in order to maintain the status quo." Without explanation, it rejected those expenses. At the same time, the court found other expenses "excessive" and reduced them, without any reasons for its conclusions.

In all, the court rejected over $1500 of appellant's expenses and found "excessive" appellant's monthly expenses for cigarettes ($273); groceries ($390); household supplies ($477); recreation and entertainment (which included restaurants, videos, and books) ($546); satellite TV ($95); and satellite repairs ($31). It reduced those expenses from $1822 to $1200.

In contrast, the court did not comment on appellee's current monthly expenses. Rather, it appears that appellee's expenses were implicitly accepted by the court. Appellee's expenses included $425 for groceries and household supplies; $60 for appliances; furniture expenses of $200; and recreation expenses totaling $570. (The recreation expenses consisted of $110 for video rentals, $40 for movies, $30 for cable, $150 for clubs, and $240 for restaurants.) Appellee's expenses were necessarily a component of the court's consideration as to alimony, because appellee's expenses affect his ability pay alimony.

When all is said and done, after carving away appellant's expenses for legal fees and the mortgage, the amount of her expenses is quite comparable to appellee's claim of $7400 per month in projected expenses. Once the mortgage for the marital home is satisfied, appellant expects expenses of $10,000 monthly.[13] After the deduction of legal fees associated with the current litigation, a sum of over $3000 per month,

---

13. Obviously, appellant will have some housing expense, but it might be far less than the cost of the mortgage for the marital home.

appellant's total expenses would decline even further. Yet, to meet his expenses, which the court accepted, appellee will have available to him a salary of at least $175,000 to $200,000, according to the court, while appellant will have $59,000 at her disposal, plus some unknown amount of investment income.

With respect to appellant's expense claim of $546 a month for recreation and entertainment, we observe that the court expressly found that expense excessive, while implicitly accepting appellee's claim of a comparable amount. Considering the parties' economic status during the marriage, it is not evident why the court considered the expense "excessive" for appellant but not for appellee. Moreover, whatever we may personally believe as to the merits of cigarette smoking, it is not illegal for appellant to smoke. It is undisputed that appellant smoked three packs of cigarettes per day, and so her monthly expenses for cigarettes would easily amount to $273, as she claimed.

Apart from appellant's dissipation claim and her *Crawford* credits claim, both of which are discussed *infra*, no challenge has been raised by either party with respect to the monetary award. We shall, however, vacate the monetary award, because of our disposition of the alimony award. The factors underlying alimony, a monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other.[14] *See* F.L. §§ 8–205(b)(9), (10); 11–106(b)(11)(ii); and 11–110(c)(1). *See also Doser v. Doser*, 106 Md.App. 329, 335 n. 1, 664 A.2d 453 (1995); *Strauss v. Strauss*, 101 Md.App. 490, 511, 647 A.2d 818 (1994), *cert. denied*, 337 Md. 90, 651 A.2d 855 (1995); *Rogers v. Rogers*, 80 Md.App. 575, 588–89, 565 A.2d 361 (1989); *Holston v. Holston*, 58 Md.App. 308, 327, 473 A.2d 459, *cert. denied*, 300 Md. 484, 479 A.2d 372 (1984). Therefore, when this Court vacates one such award, we often vacate the remaining awards for re-evaluation. *See, e.g., Alston v. Alston*, 331 Md. 496, 509, 629 A.2d 70 (1993) (remanding

---

14. We discuss the issue of counsel fees, *infra*.

alimony issue upon reversal of monetary award); *Randolph v. Randolph,* 67 Md.App. 577, 589–90, 508 A.2d 996 (1986) (vacating counsel fees award upon reversal of monetary award); *Rosenberg v. Rosenberg,* 64 Md.App. 487, 527, 537, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985) (vacating alimony award for reconsideration because monetary award was vacated).

## IV. The 1997 Agreement

In a related argument as to alimony, which may resurface on remand, appellant contends that the court erred in characterizing the Agreement in August 1997 as "interim" in nature, and in failing to enforce the Agreement. It provided for equal payment of salary to the parties from BSL, in the amount of $2500 each per week, and equal payment of bonuses.

The Agreement of August 1997 states, in pertinent part:

1. Effective August 10, 1997, wife will be paid a salary from the company at a rate of Two Thousand, Five Hundred Dollars ($2,500.00) per week; husband's salary shall be reduced to $2500.00 per week.

2. Wife will oversee by computer the company checking and/or savings account(s).

3. Wife will be sent monthly back-up tapes of the company accounting program retroactive to June, 1997.

4. On or before September 30, 1997, wife will do whatever is necessary to complete the company taxes for the years 1994, 1995 and 1996 and cooperate with Harold Davis, CPA in that endeavor.

\* \* \*

6. Any company bonuses traditionally granted in the past will be equally divided between husband and wife.

\* \* \*

9. It is further understood that this agreement is only a partial resolution of issues existing between the parties and

that it is the intention of the parties to deal with those remaining issues if they become necessary in the future."

As we noted, in the Order of December 16, 1999, the court characterized the Agreement as an "interim agreement, and reduced the amount of temporary alimony to $2000 per week. Ultimately, the court ignored the Agreement altogether, and awarded alimony of $2000 a month.

Appellant contends that F.L. § 11–106(b)(10) required the court to give effect to the Agreement, and she claims that the court erred by construing it as an "interim" one. Ms. Turner also argues that if the Agreement were meant to be an interim one, the parties would have so stated. Moreover, she complains that she was not permitted to offer parol evidence to show the parties' intent because appellee objected, claiming that the Agreement "speaks for itself." Further, although by its terms the Agreement constituted "a partial resolution" of certain issues, appellant insists that it reflects the full and final agreement as to those issues within its scope, including the appropriate sum for alimony; it was partial only in the sense that it did not resolve all outstanding issues.

Appellee acknowledges that the court did not expressly refer to the Agreement. But, he observes that the court considered the factors under F.L. § 11–106. Moreover, appellee maintains that the Agreement was superseded by the Orders of December 11, 1998 and December 16, 1999, and thus it is not "within the ambit" of F.L. § 11–106(b)(10). He also argues that the unambiguous language of the Agreement supports the trial court's finding that it was only temporary, and therefore the court did not err by failing to rely on it in the determination of alimony.

■■■ The statutory scheme is quite clear in emphasizing the significance of a separation agreement. Indeed, "Maryland has long recognized and enforced spousal support agreements." *Campitelli v. Johnston*, 134 Md.App. 689, 696, 761 A.2d 369 (2000), *cert. denied*, 363 Md. 206, 768 A.2d 54 (2001); *see Gordon v. Gordon*, 342 Md. 294, 300, 675 A.2d 540 (1996); *Moore v. Moore*, 144 Md.App. 288, 303, 797 A.2d 839 (2002),

*cert. granted,* 370 Md. 268, 805 A.2d 265 (August 22, 2002). As the *Gordon* Court said: "The prevailing view is now that 'separation agreements ... are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not contrary to public policy.'" *Id.* at 300–01, 675 A.2d 540 (quoting 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 11:7, at 396–99 (R. Lord ed., 4th ed.1993)).

Numerous statutory provisions protect the rights of parties to reach support agreements. Section 11–106(b)(10) obligates a court to consider "any agreement between the parties." Similarly, F.L. § 8–103(c)(2) limits the right of a court to modify an agreement of the parties concerning alimony; it provides that the court may not modify the provisions of an agreement as to spousal support, if the parties specify that it is "not subject to any court modification." In addition, F.L. § 11–101(c) "mandates" that the court is bound by the terms of an agreement between the parties pertaining to alimony. *See Langston v. Langston,* 366 Md. 490, 503, 784 A.2d 1086 (2001). In much the same way, an agreement between the parties as to alimony is subject to the same general rules of construction applicable to other contracts. *Bruce v. Dyer,* 309 Md. 421, 433, 524 A.2d 777 (1987); *Moore,* 144 Md.App. at 303, 797 A.2d 839.

The construction of a written contract is a question of law, subject to *de novo* review by an appellate court. *Langston,* 366 Md. at 506, 784 A.2d 1086; *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 341, 731 A.2d 441 (1999); *JBG/Twinbrook Metro Ltd. v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898 (1997); *Nationwide Ins. Companies v. Rhodes,* 127 Md.App. 231, 235, 732 A.2d 388 (1999). As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 290, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997) (citations omitted). Moreover, "the primary source for determining the intention of the parties is the

language of the contract itself." *Id.* at 291, 674 A.2d 106. In this regard, contracts are interpreted "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995). Moreover, the terms of the agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words. *See Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194 (2001); *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135 (1989).

In ascertaining the parties' intent, Maryland follows the objective law of contract interpretation. *See Taylor v. NationsBank, N.A.,* 365 Md. 166, 178, 776 A.2d 645 (2001); *B & P Enterprises v. Overland Equip. Co.,* 133 Md.App. 583, 604, 758 A.2d 1026 (2000). Under this doctrine, when a contract is clear and unambiguous, " 'its construction is for the court to determine.' " *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620 (2001) (citation omitted). Moreover, the court is required to "give effect to [the contract's] plain meaning," without regard to what the parties to the contract thought it meant or intended it to mean. *Id.* at 251, 768 A.2d 620; *see PaineWebber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029 (2001); *Ashton,* 354 Md. at 340–41, 731 A.2d 441; *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999). Generally, " 'it must be presumed that the parties meant what they expressed.' " *PaineWebber Inc.,* 363 Md. at 414, 768 A.2d 1029 (citations omitted); *Jones v. Hubbard,* 356 Md. 513, 533, 740 A.2d 1004 (1999). Put another way, the " 'test of what is meant is . . . what a reasonable person in the position of the parties would have thought' the contract meant." *Society of Am. Foresters v. Renewable Natural Resources Found.,* 114 Md.App. 224, 234–35, 689 A.2d 662 (1997) (citation omitted).

The principles of contract construction make clear that appellant cannot transform a sow's ear into a silk purse. The Agreement says nothing whatsoever about alimony; by its terms, it concerned "salary" for services that appellant was

to render to BSL. Perhaps the Agreement was a veiled way for appellee to pay alimony at BSL's expense, by labeling it as "salary." Regardless of what the parties intended while the divorce case was pending, the Agreement provides that appellant was to secure salary from BSL equal to appellee's. Because the word alimony does not appear anywhere in the Agreement, it follows that the court did not err in failing to abide by the terms of the Agreement.

## V. Crawford Credits

Appellant contends that the trial court erred in not granting her "Crawford" credits in connection with the sale of the marital home. Instead, the court ordered an equitable division of the proceeds of sale. She observes that, from July 1997 to July 1998, she paid the mortgage in its entirety, amounting to over $35,000, without any contribution from appellee. Appellant also claims that she paid the yearly real estate taxes of $4039.82, without any contribution. Therefore, appellant asserts that it was "woefully inequitable" for the court to divide the proceeds of sale without reimbursing her for these expenditures.

Ms. Turner indicates that, in the alimony *pendente lite* order of December 11, 1998, appellee paid her $2756.61 per week in alimony. That sum represented $2500 a week in alimony, plus the pro rata weekly portion of the extra monthly payment of $1112 towards the outstanding principal on the mortgage loan. From these monies, appellant actually paid the mortgage. Because appellee paid the monies directly to appellant, she notes that she had to declare the money as income, while appellee got a tax deduction for the alimony payment. As a result, by appellant's calculations, assuming a 30% tax bracket, she lost the use of $4670.40 for the period from December 1998 until January 2000. In contrast, she observes that appellee's payment to her was not as large as it seemed, because the monies were tax deductible to him. Appellant does not specify, however, who claimed the tax deduction for interest paid on the mortgage.

The court did not address the issue of contribution in the Divorce Opinion. Thus, appellant raised the matter in her motion to alter or amend. In regard to the motion, the court filed an Order of September 20, 2000, stating: "Ms. Turner seeks modification for failure to consider ... *Crawford* credits for contributions for the mortgage and real estate taxes. The fact that those payments were made was fully considered at the time the award was entered by the Court. Accordingly, no further modification will be granted on that basis."

Certainly, the court could have made an award of contribution. "Generally, one co-tenant who pays the mortgage, taxes, and other carrying charges of jointly owned property is entitled to contribution from the other." *Crawford v. Crawford,* 293 Md. 307, 309, 443 A.2d 599 (1982) (citations omitted). In *Crawford,* 293 Md. at 311, 443 A.2d 599, the Court said:

> [A] co-tenant in a tenancy by the entireties is entitled, to the same extent as a co-tenant in a tenancy in common or joint tenancy is entitled, to contribution for that spouse's payment of the carrying charges which preserve the property.

As we recognized in *Baran v. Jaskulski,* 114 Md.App. 322, 328, 689 A.2d 1283 (1997), the *Crawford* case "abolished the presumption of gift between separated spouses and permitted a spouse to seek contribution in those instances when married parties were not residing together and one of them, or the other, had paid a disproportionate amount of the carrying costs of property." *See also Freedenburg v. Freedenburg,* 123 Md.App. 729, 737 n. 1, 720 A.2d 948 (1998). Elucidating the meaning of "Crawford Credits," we said in *Baran,* 114 Md.App. at 332, 689 A.2d 1283:

> Crawford Credits-the general law of contribution between cotenants of jointly owned property applies when married parties, owning property jointly, separate. A married, but separated, co-tenant is, in the absence of an ouster (or its equivalent) of the nonpaying spouse, entitled to contribution for those expenses the paying spouse has paid.

Because preservation of the property accrues to the benefit of the co-tenant, a tenant by the entireties may also be entitled to contribution for payments of the mortgage and taxes. "Contribution is a factor that may be considered in making a monetary award. . . ." *Broseus v. Broseus,* 82 Md. App. 183, 192–93, 570 A.2d 874 (1990). Nevertheless, a trial judge is not "obligated to award such contribution between husband and wife at the time of a divorce." *Imagnu v. Wodajo,* 85 Md.App. 208, 223, 582 A.2d 590 (1990); *Kline v. Kline,* 85 Md.App. 28, 48, 581 A.2d 1300 (1990), *cert. denied,* 322 Md. 240, 587 A.2d 246 (1991); *see Wassif v. Wassif,* 77 Md.App. 750, 761–62, 551 A.2d 935, *cert. denied,* 315 Md. 692, 556 A.2d 674 (1989). Rather, the award of contribution is an equitable remedy within the discretion of the court. *Keys v. Keys,* 93 Md.App. 677, 681, 614 A.2d 975 (1992).

There are many reasons why such an award is not mandatory. For example, debt payments are often made with marital funds, "contribution is an equitable principle . . . and the ability to grant a monetary award under the Act enables the chancellor to achieve more complete equity than can be done through a *Crawford* contribution." *Kline,* 85 Md.App. at 48–9, 581 A.2d 1300. Moreover, " 'requiring contribution could create the very inequity which the Act was designed to prevent.' " *Imagnu,* 85 Md.App. at 223, 582 A.2d 590 (quoting *Spessard v. Spessard,* 64 Md.App. 83, 96, 494 A.2d 701 (1985)).

In this case, for about one year, appellee did not fund the mortgage payment at all, and appellant also paid the real estate taxes. Then, Ms. Turner made the mortgage payments from her alimony; the alimony award took into account the amount of the mortgage payment. Nevertheless, appellant also paid income taxes on the alimony, while appellee received a tax deduction. As we noted, it is not clear who received the tax benefits with respect to the interest on the mortgage.

It seems to us that, with far too many issues for the court to resolve, this one was overlooked. Because it is not clear why the court ruled as it did, we shall direct the court to reconsider this issue on remand. *See Baran,* 114 Md.App. at 332, 689

A.2d 1283 ("Even had [the husband] not agreed to it, [the wife], under the circumstances of this case, would nevertheless be entitled to it.")

## VI. The Dissipation Claim

Appellant contends that the court erred in finding dissipation by appellee of only $112,000; that finding was predicated on appellee's admission. Ms. Turner claims that she proved appellee took an additional $48,950 from a joint account on June 26, 1997.

Mr. Turner responds that the court was not clearly erroneous in finding that he did not dissipate more than the $112,000.[15] Moreover, he testified that he withdrew $46,450 from the parties' joint accounts, and left his wife with an equal sum.

Notwithstanding the discrepancy in amount, it is undisputed that appellee withdrew at least $46,000 from a joint bank account when the parties separated in 1997. Appellee testified to his use of about $34,000 of that money; he claimed $8000 was used to buy furniture and $26,000 was used for the payment of federal and State taxes. Then, on appellee's behalf, his attorney "took the Fifth" as to appellee's use of the remaining portion of the money. In the Divorce Opinion, the court referred to the sum of $48,950, rather than the $46,450 acknowledged by appellee, and said:

> Mrs. Turner seeks to attribute $48,950 in marital funds to Mr. Turner, as these constituted half of the joint bank accounts that was taken at the time he left the martial [sic] home. A similar sum was left for Mrs. Turner to utilize. Both parties have long since expended these funds. Given the even division of bank accounts at the time of separation,

---

15. As to the $112,000, it appears to us that the money was diverted from the Company and not directly from appellant. Mr. Turner has not suggested, however, that the court erred in finding that sum to have been dissipated because it belonged to BSL. Nor has he asserted that appellant had no claim to that money based on a theory of dissipation of marital property. Accordingly, the court's disposition as to that sum is not before us.

and the need for funds for living expenses and fees incurred, the Court will not consider these as marital property at this juncture.

 Ordinarily, property disposed of before trial cannot be marital property. *Collins v. Collins,* 144 Md.App. 395, 412, 798 A.2d 1155 (2002); *Gravenstine v. Gravenstine,* 58 Md.App. 158, 177, 472 A.2d 1001 (1984). When a claim is made of dissipation, the party making the claim must present affirmative evidence to establish it. *Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 309, 649 A.2d 1137 (1994). "The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation." *Id.* at 311, 649 A.2d 1137; *see Choate v. Choate,* 97 Md.App. 347, 366, 629 A.2d 1304 (1993). The *Jeffcoat* Court said, at 102 Md.App. at 311, 649 A.2d 1137:

> That party retains throughout the burden of persuading the court that funds have been dissipated, but after that party establishes a prima facie case that monies have been dissipated, i.e. expended for the principal purpose of reducing the funds available for equitable distribution, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate.

 A finding of dissipation is important with respect to the value of marital property. The *Jeffcoat* Court explained:

> "[W]here a chancellor finds that property was intentionally dissipated in order to avoid inclusion of that property towards a consideration of a monetary award, such intentional dissipation is no more than a fraud on marital rights, and the chancellor should consider the dissipated property as extant marital property . . . to be valued with other existing property."

*Id.* at 308, 649 A.2d 1137 (quoting *Sharp v. Sharp,* 58 Md.App. 386, 399, 473 A.2d 499 (1984)(internal citations omitted)); *see Beck v. Beck,* 112 Md.App. 197, 216, 684 A.2d 878 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 (1997); *Choate,* 97 Md.App. at 366, 629 A.2d 1304; *Rock v. Rock,* 86 Md.App. 598, 618–20,

587 A.2d 1133 (1991); *Melrod v. Melrod,* 83 Md.App. 180, 186–88, 574 A.2d 1, *cert. denied,* 321 Md. 67, 580 A.2d 1077 (1990).

The question remains whether appellant established that appellee used the remaining sum (i.e., $14,950 or $12,450) for his " 'own benefit for a purpose unrelated to the marriage at a time [when] the marriage [was] undergoing an irreconcilable breakdown?' " *Beck,* 112 Md.App. at 215–16, 684 A.2d 878 (citation omitted). As noted, appellee asserted the Fifth Amendment as to his use of that portion of the withdrawal.

In *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Supreme Court said that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." Similarly, in *Whitaker v. Prince George's County,* 307 Md. 368, 514 A.2d 4 (1986), the Court of Appeals ruled that the Fifth Amendment does not bar "the drawing of adverse inferences against parties to civil actions when they refuse to testify." *Id.* at 386, 514 A.2d 4. Nevertheless, the Court indicated that an adverse inference alone is not sufficient to support a finding. Rather, it must be considered along with other "relevant evidence tending to prove [the disputed] fact." *Id. Robinson v. Robinson,* 328 Md. 507, 615 A.2d 1190 (1992), is also instructive. There, the Court determined that the wife's assertion of privilege regarding her alleged adultery supported an inference that she committed adultery, but did not support an inference that she was also an unfit parent. *Id.* at 516, 615 A.2d 1190.

More recently, in *Long v. Long,* 141 Md.App. 341, 349, 785 A.2d 818 (2001), we reiterated that "a party's privileged silence alone is insufficient to permit a fact-finder in a civil case to determine liability." We underscored the need for "supporting evidence." *Id.*

In our view, this case contains ample "supporting evidence," which would have permitted the court, in its discretion, to draw an adverse inference as to appellee's use of the unexplained balance of the withdrawal, based on his invocation

of privilege. In addition to invoking the privilege, the evidence was unrefuted as to appellee's unlawful drug use, involvement with other women, and ample earned income available to meet his living expenses.

The court was satisfied that appellee used all the money that he withdrew for living expenses, although evidence was presented as to how appellee used $34,000 of the money; there was no explanation as to the remaining portion of the money. Because it does not appear that the court recognized that appellee did *not* claim that he used the entire withdrawal for living expenses or taxes, and because the evidence was sufficient to allow the court to draw an adverse inference based on appellee's invocation of privilege, we shall remand the dissipation claim for further proceedings. What inferences the court chooses to draw from the evidence will be a matter for the court's determination.

### VII. Counsel Fees

Appellant sought contribution from appellee towards her attorney's fees, which totaled about $130,000. Of that sum, the court found that at least $40,000 was attributable to the corporate action, and that "roughly $85,000 of the overall fees was expended on the divorce action." That determination is not contested by appellant on appeal. Rather, out of total legal fees of $85,000 for the divorce case, she complains because the court awarded her only $19,000. Specifically, the court awarded $6000 in counsel fees in its Order of December 16, 1999, and an additional $13,000 in the Divorce Opinion. There, the court reasoned:

> The Court has considered the statutory factors in determining an award of fees under F.L. § 11–110(c). In that regard, the Court notes that both parties have had substantial financial resources. The Court has considered the fact that there was substantial justification for Mrs. Turner to pursue this matter.

> \* \* \*

> If the Court considers that approximately $3,000 per month on the *pendente lite* alimony was to cover ongoing legal fees

and expenses, and there was a prior order for an additional $6,000 contribution towards legal expenses, $72,000 has effectively been contributed already towards fees. Having weighed and evaluated these factors, the Court has determined that contribution towards payment of fees in the additional amount of $13,000 should be made by Mr. Turner.

The court recognized that "legal fees were certainly part of the basis for the [amount of the] award of *pendente lite* alimony ..." in December 1999, when the court reduced the weekly alimony to $2000. Moreover, the court pointed out that appellant had received *pendente lite* alimony for 22 months during the pendency of the case, much of which was at $2500 per week, "*in addition to the payment of her mortgage expense.*" (Emphasis added). By its calculations, then, appellee had already paid $72,000 in attorneys' fees. That amount was arrived at based on the lump sum payment of $6000 in December 1999, and the attribution to attorneys' fees of the sum of $3000 per month out of the total monthly alimony payment (i.e., $10,000 prior to December 1999, and $8000 after December 1999).

In the court's view, the sizeable alimony award was to be used, in part, for payment of attorney's fees. The court thus believed that appellant had "sufficient funds to pay nearly all her legal bills on an ongoing basis." Put another way, the court concluded that the amount of monthly alimony was meant to cover appellant's legal fees.

 A party may request counsel fees under F.L. § 11–110. This section provides, in pertinent part:

(b) *Authority of court.*—At any point in a proceeding under this title, the court may order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding.

(c) *Required considerations.*—Before ordering the payment, the court shall consider:

(1) the financial resources and financial needs of both parties; and

(2) whether there was substantial justification for prosecuting or defending the proceeding.

*See Blake v. Blake,* 81 Md.App. 712, 730, 569 A.2d 724 (1990). The award or denial of counsel fees is governed by the abuse of discretion standard. *Coviello v. Coviello,* 91 Md.App. 638, 658, 605 A.2d 661 (1992).

As we see it, the underpinning of the court's ruling was flawed. The court was of the view that appellant had "sufficient funds" to pay her legal bills from her alimony because it believed that appellee also paid the mortgage expense, in addition to the alimony. That finding was clearly erroneous.

The actual mortgage payment was $1840 per month, and the real estate taxes, prorated, came to about $340 a month. The additional sum that appellee paid each month of $1112 was not the mortgage payment, as the court apparently believed. Rather, that was an additional payment of principal, so that the mortgage could be paid off by the year 2000, consistent with the parties' earlier intentions. Therefore, of the monies appellant received each month in alimony, she applied over $2800 per month towards the mortgage and taxes, which means appellant had about $2800 a month less available to her than the court evidently believed.

Moreover, in finding that the alimony was sufficient to cover the legal fees, the court apparently did not consider that appellant had not yet received the monetary award, and so there was no income stream to meet her expenses. In addition, the tax consequences were significant. The alimony was not, of course, tax free to appellant. Conversely, the alimony expense to appellee was not as great as it might seem, given that the payment was tax deductible to him.

Accordingly, we shall vacate the award of attorney's fees and remand for further consideration, so that the court may consider the issue of attorney's fees based on accurate factual underpinnings.

## VIII and IX. The Corporate Claims

Appellant complains that the trial court erred or abused its discretion in denying various claims in the corporate suit. In particular, the court ruled against appellant with regard to her claims for Breach of Fiduciary Duty–Injunctive Relief (Count II); Constructive Fraud (Count IV); Declaratory Judgment (Count VI); and Breach of Fiduciary Duty–Money Damages– Derivative Action (Count IX); Breach of Fiduciary Duty– Injunctive Relief–Derivative Action (Count X); and An Accounting–Derivative Action (Count XI).

In Count XI, appellant sought an accounting from BSL and appellee to ascertain the exact amount of money diverted from BSL. As a stockholder, she asked the court to order appellees to "render a descriptive account for the income and expenses associated with the corporation from January 1, 1995 to date." Appellant also asked for judgment "for any amount found to be due and owing BSL ...," claiming that Mr. Turner misappropriated monies from BSL.

Appellant points out that, on June 9, 1997, when Mr. Turner's fraudulent conduct was discovered, it was believed that he had only taken $28,000, but the sum continued to escalate until, by March 1999, Mr. Turner admitted that he took $112,000. Appellant avers that the amount involved far exceeds the sum acknowledged by Mr. Turner. In an effort to discover the facts, appellant sought the computer passwords, but appellee "stonewalled."

Appellees assert that appellant waived her claim for an accounting because she failed to object to the motion to dismiss Count XI, which the court granted on September 29, 1999. As appellant observes in her reply brief, however, Count XI was filed against both BSL and Mr. Turner, but the motion was filed only by Mr. Turner. Therefore, appellant maintains that the accounting claim is "still outstanding as to BSL as a party...."

The following testimony is relevant to the accounting claim:

[APPELLANT'S ATTORNEY]: [H]ave you allowed [appellant] to go in and examine the company files, all of them for '93, '94 rather, '95, '96 and '97 and '98 to see?

[MR. TURNER]: There's nothing for '98.

[APPELLANT'S ATTORNEY]: Just a moment. To see whether or not you got all the NC files? Have you allowed her to do that?

[MR. TURNER]: How would she know if I don't?

[APPELLANT'S ATTORNEY]: Have you allowed her to exam[ine] the files to determine whether or not you've declared all the NC or not? Yes or no.

[MR. TURNER]: No. I have not.

[APPELLANT'S ATTORNEY]: Now, you've heard her testify, did you not, that she could determine the NC based upon the payroll for the job and the amount of income coming in from the job to see if they were disproportionate. Didn't you hear that?

[MR. TURNER]: I did hear that.

[APPELLANT'S ATTORNEY]: But you haven't allowed her to do that, have you, sir?

[MR. TURNER]: No, I haven't.

[APPELLANT'S ATTORNEY]: If you've made full disclosure, what possible harm could there be in doing that, Mr. Turner?

[MR. TURNER]: None.

[APPELLANT'S ATTORNEY]: Yet you've refused to allow it anyway; isn't that correct?

[MR. TURNER]: Yes. If that's a yes or no question, yes.

As we related earlier, beginning in 1976, the parties did not declare all of the monies they obtained from BSL, which they referred to as "NC" money. Ms. Turner was well aware of the practice, but blamed her husband for the conduct, suggesting that she merely did what she was told. In any event, appellant contends that the parties agreed in 1994 to cease the practice but, between 1995 and 1998, without her knowledge or permission, appellee resumed his conduct.

It is clear that, until 1994, appellant acted in concert with her husband in the NC scheme. The following colloquy is relevant:

[MR. TURNER'S ATTORNEY]: *You knew when you made that allegation, did you not, Mrs. Turner, that the corporation had, in fact, been diverting funds-that you and your husband had been diverting funds since the beginning of the business.*

[APPELLANT]: I personally never diverted any funds.

[MR. TURNER'S ATTORNEY]: Your reason for that is that the procedure was from the NC money. *Your husband would hand you amounts of cash; is that correct?*

[APPELLANT]: *That's correct.*

[MR. TURNER'S ATTORNEY]: And then the amounts of cash that he gave you, ma'am, *you apportioned that into two areas: One for employees and one for the Turners, correct?*

[APPELLANT]: *That's correct.* At his direction.

The court found that Ms. Turner was aware of the practice of not including all of BSL's revenue on the corporate books and "participated in it." The court said:

According to her testimony, her husband would hand her cash from a particular job and then tell her how the money should be apportioned between employees and them. Mrs. Turner would account for the money in envelopes at his direction, and she maintained records on this practice over the years. The monies that came to the Turners through this NC practice were kept in their home safe, and then were used by Mrs. Turner for various household purposes.

The court then said:

The NC practice came to a halt by agreement of the parties in approximately 1994, as a result of an EEOC charge filed by an employee. In the course of handling the EEOC matter, the employee threatened to disclose the NC practice to the IRS. Thereafter, Diane and Don Turner agreed to discontinue the NC practice with BSL funds.

At the time the parties separated, Mrs. Turner discovered records in Mr. Turner's office that demonstrated that he had reinstituted NC practices in the period between 1995 and 1997.

Additionally, the court found that, shortly after the separation, appellant "wrote an unauthorized check to herself on corporate funds in the amount of $30,000." The court rejected appellant's explanation that she did so to force appellee to replenish the corporate account, stating that it did not square with appellant's testimony that appellee had "the ability to take sums out of the business whenever they are needed." In the court's view, appellant's conduct was an act of "retaliation."

Although the court did not specifically discuss the accounting claim, it resolved that claim and the "remaining counts" under the general heading of "Equitable Estoppel." The court ruled:

> In this case, Mrs. Turner complains about her husband's unauthorized diversion of "NC" funds during the period from 1995 to 1997. She would distinguish this from their joint diversion of "NC" funds during the period from around 1976 to 1994. She would also distinguish this from her own unauthorized withdrawal of $30,000 in corporate funds in 1997. She would also ignore her early negotiations to overlook her husband's NC relapse if like funds were provided to her.
>
> Under these circumstances, the doctrine of unclean hands serves to bar Mrs. Turner's claims for corporate relief based upon diversion of funds. She was complicit in this precise activity over a course of nearly 20 years and will not be heard to complain about it now solely on the basis that profits from fraud were not evenly shared.[16]

---

16. The court also relied on unclean hands to bar appellee's counterclaim to recover the $30,000 taken by Ms. Turner. That ruling is not challenged on appeal by appellees.

Ms. Turner contends that the court erred because her prior wrongdoing was irrelevant. Moreover, she points out that her unlawful conduct ceased in 1994, and she never hid funds from another shareholder, as Mr. Turner did. She asserts:

> To hold under those circumstances that Diane Turner is barred from bringing a claim against the majority shareholder for essentially stealing monies from that minority shareholder is an improper use of the unclean hands doctrine and was an abuse of the sound discretion of the Trial Court. Indeed, to deny even an accounting on such a basis as the Court did here is to literally grant a *license to steal* to Mr. Turner because of a procedure he put in place years ago in the first instance. Those monies years ago were shared-this time he took them all for himself and the Court essentially gave him license to do so.

\* \* \*

> Regardless of any past practice of not declaring cash years before along with Mrs. Turner demanding an accounting in part so that she could receive her fair share of the monies wrongfully taken from the company of which she was a shareholder, such conduct is not engaging the Court in endorsing or rewarding inequitable conduct!

\* \* \*

> Equity does not demand that its suitors shall have led blameless lives as to other matters but only requires they shall have acted fairly and without fraud or deceit as to the controversy in issue.

This Court addressed the matter of an accounting in *Golub v. Cohen*, 138 Md.App. 508, 772 A.2d 880, *cert. denied*, 365 Md. 474, 781 A.2d 779 (2001). Upholding the trial court's denial of an accounting, we said:

> "A suit for accounting is generally tried in two stages; the first stage concerns whether there is any right to such an accounting, and only if it is determined that there is such a right does the proceeding move on to the second stage,

which comprises the actual accounting. . . . Under the bifurcated process, the determination of whether a party has a right to an accounting is made by the court, and the burden of proof is on the party seeking the remedy, who must establish, by a preponderance of the evidence, that he or she has the right to an accounting. . . . *Discovery as to an accounting must be deferred until the preliminary issue of the right to an accounting is settled.*"

*Id.* at 520, 772 A.2d 880 (citation omitted) (emphasis added in *Golub* ).

" 'Without the rule,' " explained the *Golub* Court, " 'any person could inspect the private records of another by the simple device of filing a complaint against the latter asking for an accounting.' " *Id.* at 520, 772 A.2d 880 (citation omitted). Thus, *Golub* made clear that the first inquiry concerns "whether there is any right to an accounting." *Id.* Moreover, " 'the determination of whether a party has a right to an accounting is made by the court. . . .' " *Id.* (citation omitted).

 In the case *sub judice,* the court's reasoning supports its decision to deny the request for an accounting and the remaining corporate claims. The equitable doctrine of unclean hands is "designed to 'prevent the court from assisting in fraud or other inequitable conduct. . . .' " *Gordon v. Posner,* 142 Md.App. 399, 433, 790 A.2d 675 (quoting *Adams v. Manown,* 328 Md. 463, 482, 615 A.2d 611 (1992)), *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002). It is available to deny relief to those guilty of unlawful or inequitable conduct with respect to the matter for which relief is sought. *Hicks v. Gilbert,* 135 Md.App. 394, 400, 762 A.2d 986 (2000). It is "not applied for the protection of the parties nor as a punishment to the wrongdoer." *Adams v. Manown,* 328 Md. at 474–75, 615 A.2d 611. Instead, "it protects the integrity of the court and the judicial process by denying relief to those persons 'whose very presence before a court is the result of some fraud or inequity.' " *Hicks,* 135 Md.App. at 400, 762 A.2d 986 (citation omitted).

■ To be sure, there must be a nexus between the misconduct and the transaction, because " 'what is material is not that the plaintiff's hands are dirty, but that [she] dirties them in acquiring the right [she] now asserts.' " *Id.* at 400–401, 762 A.2d 986 (citation omitted). That nexus is present here. Appellant previously aided her husband in diverting funds from BSL. Although the idea may have originated with appellee, and Ms. Turner's participation in the illegal conduct ended about a year before Mr. Turner resumed the practice, appellant was a willing participant at the outset.

We acknowledge that the parties agreed to cease the NC practice, and appellee resumed the illicit conduct without appellant's knowledge or consent. Nevertheless, the trial court was not obligated to overlook her earlier complicity. Moreover, as a matter of equity, the court barred appellee's effort to recover the $30,000 from appellant that she was found by the court to have diverted. Therefore, we perceive neither error nor abuse.

## X. The Fifty Percent Claim

In Count VI of the Second Amended Complaint, appellant sought a declaratory judgment, asking "that she be awarded the 50 percent of BSL that was repeatedly promised to her by [appellee]." Appellant contends that the trial court erred in denying her an equal interest in BSL. She also insists that a constructive trust should have been imposed, because appellee improperly acquired a greater number of shares of BSL by fraud and misrepresentation. Appellant argues that, "[u]nder the circumstances of this case, given the joint effort of the parties in the success of BSL," and Mr. Turner's repeated representations to her that "it did not make any difference how the stock was issued for BSL," the court should have declared "that 50 percent of the shares [of BSL] be held in constructive trust for [appellant]."

Appellees counter that the claim is not preserved for review, because appellant did not assert a claim for constructive trust. They also argue that such a claim is "legally and factually unsupportable."

Appellant relies on *Levin v. Levin*, 43 Md.App. 380, 405 A.2d 770 (1979), to support her claim. *Levin* was a divorce case in which the parties disputed the amount of the wife's interest in the husband's business enterprises. Joel Levin and his wife owned Phoenicia Corporation, a liquor store business. Levin and another businessman, Edward Legum, entered into a contract to acquire an apartment property, referred to as the Allen Corporation. *Id.* at 384, 405 A.2d 770. Ms. Levin co-signed the note to acquire the property. Appellant also purchased a yacht and titled it in his name. As part of the divorce decree, the court awarded the wife (1) a 50% interest in Phoenicia Corporation; (2) a 25% interest in Allen Corporation; and (3) a 50% interest in the yacht. *Id.* at 381–82, 405 A.2d 770. On appeal, the husband contended that the trial court erred. In upholding the trial court, we said, at 43 Md.App. at 386, 405 A.2d 770:

Most, if not all, of the money used to purchase the business came from joint assets and from a loan made to the parties jointly. The lease for the business premises was in joint names and the business was purchased by Joel and Marilyn jointly. Thereafter both parties devoted full time to the business until Marilyn was required to discontinue working because of ill health. The auditor's report revealed that liquor licenses for the business from 1972 through 1976 stated that Marilyn and Joel each owned fifty [percent] of Phoenicia's stock.

The Court further explained "Joel's portion of the required funds was raised through a loan from M & R Holding Company to Joel and Marilyn. It is undisputed that Marilyn co-signed the note evidencing that loan." *Id.* at 387–88, 405 A.2d 770. The Court also recognized that "Marilyn joined Joel in borrowing those funds only after he had persuaded her that the investment would be a good one for the two of them." *Id.* at 388, 405 A.2d 770. As to the yacht, the Court adopted the chancellor's findings that the parties intended to jointly own the boat, and it was paid by means of a loan to both parties and funds derived from one of the jointly owned corporations.

*See id.* at 388–89, 405 A.2d 770. In upholding the constructive trust, the Court said:

" 'A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence, or mistake, or through a breach of fiduciary duty, or through wrongful disposition of another's property.' "

*Id.* at 389, 405 A.2d 770 (quoting *Carter v. Abramo*, 201 Md. 339, 343, 93 A.2d 546 (1953)).

More recently, in *Dulany v. Taylor*, 105 Md.App. 619, 660 A.2d 1046 (1995), the Court said:

"A constructive remedy is a remedy employed by the courts to convert the holder of legal title to property into a trustee 'for one who in good conscience should reap the benefits of the possession of said property.' The remedy is applied where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the title holder to retain the property. The purpose of imposing a constructive trust is to prevent the unjust enrichment of the holder."

*Id.* at 634, 660 A.2d 1046 (quoting *Hamilton v. Caplan*, 69 Md.App. 566, 583–84, 518 A.2d 1087 (1987)(internal citations omitted); *see Wimmer v. Wimmer*, 287 Md. 663, 668, 414 A.2d 1254 (1980); *Siemiesz v. Amend*, 237 Md. 438, 442, 206 A.2d 723 (1965)); *Jahnigen v. Smith*, 143 Md.App. 547, 556, 795 A.2d 234, *cert. denied*, 369 Md. 660, 802 A.2d 439 (July 18, 2002).

■ Mr. Turner owned 87% of the shares of BSL. His technical knowledge and skill were obviously crucial to the success of BSL. Although Ms. Turner was instrumental in running the business, and contributed to the Company's success, it goes without saying that BSL depended on appellee's expertise. Given the parties' respective roles in regard to

BLS, it was not inherently inequitable or improper for fewer shares to be titled to appellant.

We note, too, that appellant testified that her husband assured her that she had an "equal" interest in BSL, and thus it did not matter how the stock was titled. She did not claim, however, that appellee promised to give her an equal number of shares. The court acknowledged appellant's 50% interest in BSL by awarding appellant 55% of the marital property, inclusive of BSL.

Based on our review of the record, the court's factual findings were not clearly erroneous, the court was not legally incorrect, nor did it abuse its discretion.

## XI. Disregarding the Corporate Entity

As an alternative theory of relief, appellant asked the court to disregard the corporate entity of BSL. The court declined to do so, stating:

> Plaintiff next argues that the BSL corporate entity should be disregarded and that this court should use it's [sic] equitable powers to determine ownership. A Maryland court may pierce the corporate veil only based on fraud or proof that it is necessary to enforce a paramount equity. The rule regarding paramount equities applies when substantially all the stock of a corporation is owned by a single individual, and other factors clearly demonstrate a disregard of the corporate structure. If those factors exist, in order to promote fundamental equity and fairness, courts have experienced "little difficulty" and have shown no hesitancy in applying what is described as the "alter ego" or "instrumentality" theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder. *Travel Committee, Inc. v. Pan American World Airways, Inc.*, 91 Md.App. 123, 158–59 [603 A.2d 1301] (1992) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir.1976)). However, this doctrine is applied when a shareholder/owner is using the corporate entity as a shield for the perpetration of a fraud against a third party. *See Bart Aconti [Arconti] & Sons, Inc. v.*

*Ames Ennis, [Ames–Ennis] Inc.*, 275 Md. 295, 310 [340 A.2d 225] (1975). There are no Maryland cases allowing an actual stockholder to disregard the corporate structure of an entity in which he or she owns stock in order to reconfigure that entity.

In this case, BSL is a close corporation. The parties have not demonstrated a wholesale disregard for that structure. The court finds no authority or factual basis to disregard that entity.

Appellant provides several reasons as to why, in her view, the court should have pierced the corporate veil: (1) Under § 4–402 of the Md.Code (1975, 1999 Repl.Vol.), Corporations and Associations Article ("C.A."), the By-laws were supposed to provide for an annual meeting, but did not do so; (2) Under C.A. § 4–501, any additional issuance of shares must be approved by all shareholders, which did not occur; (3) the corporation did not hold meetings in over twenty years; and (4) appellee treated the corporation's assets as his own. Thus, appellant states:

> Here, the fact that formalities were not observed, that Mr. Turner siphoned corporate funds and that the corporate records are unorganized, incomplete and inconsistent, all play into the argument that the veil should be pierced and the Court should have cast aside this fiction and rely on its equitable powers to determine ownership.

Appellees counter that appellant failed to allege a cause of action for piercing the corporate veil. Given the extraordinary nature of the relief, appellees argue that appellant had the burden to set forth her claim in a separate count, rather than in a general prayer for relief. *See* Md. Rule 2–303; *Scott v. Jenkins*, 345 Md. 21, 690 A.2d 1000 (1997). Appellees also point out that BSL is a "solvent, viable corporation." Indeed, the expert valuations of both sides amply support that assertion.

To be sure, appellant included numerous claims in two suits. Even if we were inclined to overlook her omission of a separate claim, she would fare no better. We explain.

A corporation is regarded as a separate legal entity. Consequently, its shareholders are ordinarily insulated from liability for the debts of the corporation. *See Ferguson Trenching Co., Inc. v. Kiehne,* 329 Md. 169, 175, 618 A.2d 735 (1993); *Rosenbloom v. Electric Motor Repair Co.,* 31 Md.App. 711, 720, 358 A.2d 617 (1976). Similarly, "when an official or agent signs a contract for his corporation it is simply a corporate act. It is not the personal act of the individual, and he is not personally liable for the corporate contract unless the matter is tainted by fraud...." *Ferguson,* 329 Md. at 175, 618 A.2d 735 (quoting *Ace Dev. Co. v. Harrison,* 196 Md. 357, 366, 76 A.2d 566 (1950)); *see Curtis G. Testerman Co. v. Buck,* 340 Md. 569, 576–77, 667 A.2d 649 (1995); *Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.,* 275 Md. 295, 312, 340 A.2d 225 (1975); *Damazo v. Wahby,* 259 Md. 627, 633–35, 270 A.2d 814 (1970); *see also Gordon v. S.S. Vedalin,* 346 F.Supp. 1178, 1180 (D.Md.1972) ("[U]nder Maryland law, an agent who makes a contract for and on behalf of a corporate principal is personally liable on the obligation only in the presence of fraud, and the burden of proof of the fraud rests upon the creditor.").

> An individual who signs a contract on behalf of the corporation is cloaked in the mantle of the enterprise and is not personally liable for action taken in the corporate name. If the enterprise defaults on an obligation under the contract, the creditor normally cannot proceed against the individual.

R. Thompson, *Unpacking Limited Liability: Direct and Vicarious Liability of Corporate Participants for Torts of the Enterprise,* 47 VAND. L.REV. 1, 7 (1994).

In *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.,* 126 Md.App. 294, 728 A.2d 783, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999), we said:

> The standard for piercing the corporate veil is as follows:
>
> "[T]he most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, *shareholders general-*

*ly are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity."*

*Id.* at 306, 728 A.2d 783 (quoting *Bart Arconti & Sons, Inc.,* 275 Md. at 310, 340 A.2d 225)(emphasis added).

The Court added that "a Maryland court may pierce the corporate veil only based on fraud or proof that it is necessary to enforce a paramount equity." *Id.* at 306–07, 728 A.2d 783. The rule regarding a paramount equity is as follows:

> "[W]hen substantial ownership of all the stock of a corpora-
> tion in a single individual is combined with other factors
> clearly supporting disregard of the corporate fiction on
> grounds of fundamental equity and fairness, courts have
> experienced 'little difficulty' and have shown no hesitancy in
> applying what is described as the 'alter ego or 'instrumen-
> tality' theory in order to cast aside the corporate shield and
> fasten liability on the individual stockholder."

*Residential Warranty Corp.,* 126 Md.App. at 307, 728 A.2d 783 (quoting *Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 158–59, 603 A.2d 1301 (1992)) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976)).

The burden of proof was on appellant. *See Dama-zo v. Wahby,* 259 Md. at 634, 270 A.2d 814. The factors to determine "whether a paramount equity should be enforced include, *inter alia,* 'whether the corporation was grossly un-dercapitalized, ... the dominant stockholder's siphoning of corporate funds, ... the absence of corporate records, and the corporation's status as a facade for the stockholders' opera-tions.' " *Residential Warranty Corp.,* 126 Md.App. at 307, 728 A.2d 783 (quoting *DeWitt,* 540 F.2d at 686–87).

Corporate estoppel "is generally employed where the person [or entity] seeking to hold the officer personally liable has contracted or otherwise dealt with the association in such a manner as to recognize and in effect admit its existence as a corporate body." *Cranson v. International Business Ma-*

*chines Corp.*, 234 Md. 477, 481, 200 A.2d 33 (1964). *Cranson* is instructive.

In *Cranson*, Albion C. Cranson, Jr., the president of Real Estate Service Bureau (the "Bureau"), entered into negotiations on behalf of the Bureau with IBM to purchase electric typewriters. These negotiations culminated in the purchase of typewriters during the period from May 17, 1961 to November 8, 1961. Although the Bureau's certificate of incorporation had been signed and acknowledged prior to May 1, 1961, it was not filed until November 24, 1961, due to an oversight by the Bureau's attorney. By that time, eight typewriters had been purchased. Clearly, Cranson entered into the negotiations in a representative capacity and never intended to assume any personal obligation. Nevertheless, when IBM was unable to collect payment from the Bureau, it sued Cranson for the monies. After the trial court granted summary judgment in favor of IBM, Cranson appealed.

On appeal, the Court considered whether Cranson was personally liable to IBM. In considering the application of the corporate estoppel doctrine, the Court "emphasized the course of conduct between the parties," *id.* at 487, 200 A.2d 33, and the "substantial dealings between [the parties] on a corporate basis." *Id.* The Court explained, at 234 Md. at 486, 200 A.2d 33:

> [W]here the parties have assumed corporate existence and dealt with each other on that basis, the Court will apply the estoppel doctrine on the theory that the parties by recognizing the organization as a corporation were thereafter prevented from raising a question as to its corporate existence.

The Court also noted that "the courts of other jurisdictions have held that where one has recognized the corporate existence of an association, he is estopped to assert the contrary with respect to a claim arising out of such dealings." *Id.* at 489, 200 A.2d 33.

Distinguishing the *de facto* corporation doctrine from corporate estoppel, the Court recognized that there is

a wide difference between creating a corporation by means of the *de facto* doctrine and estopping a party, due to his conduct in a particular case, from setting up the claim of no incorporation. Although some cases tend to assimilate the doctrines of incorporation *de facto* and by estoppel, each is a distinct theory and they are not dependent on one another in their application.

*Cranson*, 234 Md. at 487, 200 A.2d 33. Because IBM "dealt with the Bureau as if it were a corporation and relied on its credit rather than that of Cranson," the Court concluded that IBM was "estopped to assert that the Bureau was not incorporated at the time the typewriters were purchased." *Id.* at 488, 200 A.2d 33. *See Crosse v. Callis*, 263 Md. 65, 72–75, 282 A.2d 86 (1971); *Hill v. County Concrete Co., Inc.*, 108 Md.App. 527, 537, 672 A.2d 667 (1996) (stating that the *Cranson* Court "recognize[d] the doctrine of corporate estoppel and distinguished it from the doctrine of *de facto* corporations"); *see also Wolfe v. Warfield*, 266 Md. 621, 629, 296 A.2d 158 (1972); *Cardellino v. Comptroller of the Treasury*, 68 Md.App. 332, 340, 511 A.2d 573, *cert. denied*, 307 Md. 596, 516 A.2d 567 (1986); 8 *Fletcher Cyclopedia Corporations* §§ 3910, 3911, at 225, 231 (Perm. Ed.1992).

 Applying to this case the spirit of the Court's reasoning in *Cranson*, we conclude that appellant is estopped from denying the corporate status of BSL. Appellant received substantial sums over the years from BSL. Moreover, appellant has consistently recognized BSL as a corporation. The adage, "What is good for the goose, is good for the gander," seems particularly apt here.

 Were we to conclude, as appellant urges, that BSL is really a partnership or an unincorporated association, such a determination would not automatically expose appellee to individual liability. Maryland Code (1974, 1998 Repl.Vol.), § 11–105 of the Courts and Judicial Proceedings Article ("C.J.") provides:

§ 11–105. **Judgment against unincorporated association.**

In any cause of action affecting the common property, rights, and liabilities of an unincorporated association, joint stock company, or other group which has a recognized group name, a money judgment against the group is enforceable only against the assets of the group as an entity, but not against the assets of any member.

*See Himelstein v. Arrow Cab,* 113 Md.App. 530, 539, 688 A.2d 491 (1997) (" '[C.J. § 11–105] is in accordance with the theory that while the unincorporated association may be liable for the torts of one of its individual members, and the individual members may be liable for the torts of the association, the individual members are not liable for one another's torts.' "), *aff'd,* 348 Md. 558, 705 A.2d 294 (1998); *Rubin v. Weissman,* 59 Md.App. 392, 406–07, 475 A.2d 1235 (1984).

Despite the notion that a court may pierce the corporate veil to enforce a paramount equity, appellant has not referred us to any Maryland case in which the corporate veil was pierced on grounds other than fraud. *See Residential Warranty Corp.,* 126 Md.App. at 307, 728 A.2d 783; *see also Travel Committee,* 91 Md.App. at 158, 603 A.2d 1301 (stating that, "[n]otwithstanding its hint that enforcing a paramount equity might suffice as a reason for piercing the corporate veil, the Court of Appeals to date has not elaborated upon the meaning of this phrase or applied it in any case of which we are aware"). *See also* G. Michael Epperson & Joan M. Camny, The Capital Shareholder's Ultimate Calamity: Pierced Corporate Veils and Shareholder Liability in the District of Columbia, Maryland, and Virginia, 37 Cath. U.L.Rev. 605, 621 (1988) (stating that Maryland Courts "have not found an equitable interest more important than the state's interest in limited shareholder liability.")

We must assess the evidence in light of the guiding principles of corporate law set forth above. Appellant did not meet her burden of proof. Any other conclusion would eviscerate an undergirding principle of corporate law: a corporation, in the ordinary course, is a separate legal entity. Accordingly, we perceive neither error nor abuse in the trial court's decision not to pierce the corporate veil.

## XII. Wrongful Discharge Claim

In Count V of the corporate suit, appellant sued BSL and Mr. Turner for wrongful discharge. In her brief, she alleges that she was improperly terminated because she discovered Mr. Turner's theft of monies from BSL and reported it to the IRS. Appellant contends that the circuit court erred because it did not make a finding of fact as to the reason for her discharge from employment.

In addition, appellant points out that both BSL and Mr. Turner sought dismissal of the wrongful discharge claim. By its own counsel, BSL moved to dismiss on June 18, 1999. In a "Motions Ruling" of September 29, 1999, the motions judge granted Mr. Turner's motion, without ruling on BSL's motion to dismiss Count V. Therefore, appellant insists that the claim was left open as to BSL, yet the trial court declined to address Count V, apparently assuming that it had been dismissed as to both Mr. Turner *and* BSL. Because the motions court did not rule on BSL's motion, appellant maintains that the trial court "should have decided that issue."

In its opinion of June 7, 2000, the court included a "clarification of rulings on corporate claims" with respect to its opinion of April 11, 2000. There, the court said that the motions judge "clearly dismissed Count V as against Don Turner and BSL, and this court will not reconsider his Ruling." Based on our review of the record, however, we agree with appellant that the wrongful discharge claim as to BSL was not disposed of on motion. Accordingly, we shall remand this claim for further consideration.

For the benefit of the court upon remand, we note the recent opinion of the Court of Appeals in *Wholey v. Sears, Roebuck and Co.*, 370 Md. 38, 803 A.2d 482 (2002). In that case, the Court announced the existence of "a clear public policy mandate ... in the State of Maryland which protects [at-will] employees from a termination based upon the reporting of suspected criminal activities to the appropriate law enforcement authorities." *Id.* at 43, 803 A.2d 482. We express no opinion, however, as to whether the facts of this case

fall within the purview of the Court's pronouncement in *Wholey.* Indeed, if appellant were to prevail as to her wrongful discharge claim, it would seem to diminish her alimony claim.

## XIII. The Right of Inspection

■ Appellant complains that the trial court improperly limited her right to inspect and copy documents of BSL to Wednesday of each week, during business hours. This claim is without merit.

By Order dated June 13, 2000, the trial court granted appellant "on-line remote computer access" to BSL's business records. Ms. Turner was also provided with backup tapes reflecting BSL's transactions. In appellant's view, however, the restriction of her inspection to one day per week violates C.A. § 4–403. Appellees respond that Ms. Turner never alleged in her suit that she was deprived of her right to inspect, and the court's conduct was reasonable, in light of her disruptive behavior. We agree.

C.A. § 4–403 provides:

### § 4–403. Stockholders' Right of Inspection.

A stockholder of a close corporation or his agent may inspect and copy during usual business hours any records or documents of the corporation relevant to its business and affairs, including any:

(1) Bylaws;

(2) Minutes of the proceedings of the stockholders and directors;

(3) Annual statement of affairs;

(4) Stock ledger; and

(5) Books of account.

Pursuant to appellees' request, the court granted a temporary restraining order against appellant for the following alleged acts: (1) raiding $30,000 from BSL's bank account; (2) withholding BSL's vital financial records; (3) harmful and disruptive threats against BSL employees; and (4) tortious interference with contractual relations. Although the court

granted Ms. Turner access to the Company, we do not believe the statute foreclosed the court from imposing reasonable limitations on the inspection right, given its belief that Ms. Turner's behavior was disruptive. In light of the allegations of disturbances caused by Ms. Turner while at BSL, the trial court properly exercised its discretion in balancing BSL's right to conduct its business without disruption and Ms. Turner's right of access to BSL.

**APPELLEES' MOTION TO DISMISS APPEAL DENIED. IN THE DIVORCE CASE, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED AS TO THE ISSUES OF ALIMONY, MONETARY AWARD, CONTRIBUTION, DISSIPATION, AND ATTORNEYS' FEES; IN THE CORPORATE CASE, JUDGMENT VACATED AS TO BSL WITH RESPECT TO WRONGFUL DISCHARGE CLAIM, AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL OTHER RULINGS AFFIRMED. COSTS TO BE PAID 50% BY APPELLANT, 50% BY APPELLEES.**